#26260-a-GAS

**2013 S.D. 55**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,            Plaintiff and Appellee,

    v.

HEIDI WALOKE,                       Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JANINE M. KERN
Judge

* * * *

MARTY J. JACKLEY
Attorney General

KELLY MARNETTE
Assistant Attorney General
Pierre, South Dakota           Attorneys for plaintiff
                                 and appellee.

THOMAS M. DIGGINS of
Pennington County Public
 Defender's Office
Rapid City, South Dakota        Attorneys for defendant
                                 and appellant.

* * * *

CONSIDERED ON BRIEFS
ON APRIL 22, 2013

OPINION FILED **07/17/13**

#26260

SEVERSON, Justice

[¶1.] Heidi Waloke was convicted of manslaughter in the first degree. Waloke appeals her conviction and raises three issues: (1) whether the trial court erred in denying her motion to suppress and motion to exclude the evidence of the first interrogation; (2) whether the trial court erred in denying her request to instruct the jury on the lesser included offense of second degree manslaughter; and (3) whether the trial court erred in denying her request to instruct the jury on the elements of burglary. We affirm the trial court.

## BACKGROUND

[¶2.] On Sunday, May 22, 2011, Heidi Waloke was at her apartment in Rapid City with her two daughters, ages two and seven. Waloke's brother, Chastyn Waloke, was also present at her apartment. Waloke and Chastyn were consuming alcohol during the day in Waloke's apartment with several of Chastyn's acquaintances, and eventually, Jada Jeunesse, a relative of Waloke and Chastyn. Waloke later testified that she was drinking because she was upset with her boyfriend, Robert Arguello, the father of her unborn child.

[¶3.] Waloke and Jeunesse continued to drink into the early morning hours of Monday, May 23, 2011. At some point, there was a verbal and physical altercation between Waloke and Jeunesse in the kitchen of the apartment. Waloke swung a knife at Jeunesse. A later examination of Jeunesse found an incised wound on the left side of her neck; a stab wound under her chin; a large stab wound to the center of her chest; an incised wound to her left arm; a cut on her left little toe; small cuts and scrapes on her right foot; bruising on the back forearm of her

right arm; and two stab wounds to her back. A forensic examiner later determined that Jeunesse's death was caused by the stab wound in her chest through her heart. Waloke was bruised on her face and back, had a red mark on her neck, and had cuts and scrapes to her arms and feet.

[¶4.] During the altercation, Chastyn was sleeping on the couch in the living room of the apartment, next to the kitchen. Chastyn woke up because of the shouting, went into the kitchen, and saw Jeunesse lying on the floor. Chastyn called Waloke's boyfriend, Arguello, and told him that there was a problem at Waloke's home. Arguello was near Hill City for work and returned to Waloke's apartment. On his way back, he called his brother, Jeff Arguello, and mother, Anna Smits, and asked that they meet him at the apartment complex.

[¶5.] When he reached the apartment complex, Arguello and his brother went into Waloke's apartment while Smits waited outside. Around 8:50 a.m. on May 23, 2011, Smits called 911 to report that a person was stabbed at Waloke's apartment.

[¶6.] Rapid City Police Officers Jim Hansen and Dan Mertz were the first to arrive. Smits directed them to the apartment. The officers entered the apartment and saw Waloke sitting and rocking back and forth against a chair in the living room. Arguello and his brother stood next to Waloke. Chastyn was in the kitchen. Officer Hansen saw Jeunesse on the floor of the kitchen and approached her to see if she was still breathing. Officer Hansen saw that Jeunesse had a large wound in her chest and contacted dispatch to get medical personnel to come quickly.

[¶7.] Paramedics and firefighters arrived at the apartment. Paramedics attempted to resuscitate Jeunesse at the apartment, and then transported her to the hospital. Jeunesse was pronounced dead at the hospital.

[¶8.] Other officers arrived at Waloke's apartment, including Rapid City Police Officer Robin Black. Officer Black was instructed to watch Waloke and Chastyn. Officer Black administered a preliminary breath test to Waloke. Waloke had a blood alcohol content of .259. Officer Black put Waloke in her patrol car and transported Waloke to the Public Safety Building (PSB). During the ride to the PSB, Waloke asked Officer Black about her brother Chastyn. Waloke stated that Jeunesse was mean to her throughout the night. Waloke also said that she could always count on her brother and that Chastyn would say that he did it. Officer Black arrived at the PSB around 9:15 a.m. and put Waloke into an interview room. Officer Black brought water to Waloke and told her to try to get some rest. Waloke remained in the interview room, sleeping on and off until approximately 12:30 p.m.

[¶9.] Around 12:30 p.m., Rapid City Police Sergeant Warren Poches, Pennington County Sheriff Investigator Edwin Schultz, and Officer Black entered the interview room to speak with Waloke. Officer Black administered another preliminary breath test and Waloke's blood alcohol content was .210. Officer Black left the interview room after administering the breath test. Sergeant Poches asked Waloke if she knew where she was and if she knew what day it was. Waloke said that she was at the jail or police station and that it was Sunday the 21st. Then Sergeant Poches read Waloke her *Miranda* rights. When asked if she understood her rights, Waloke responded "yes." When asked if she wished to waive her rights

and speak with the officers, Waloke told officers she would speak with them. Sergeant Poches asked Waloke to explain those rights. Waloke was silent and then responded that "it's a nonsense point." Sergeant Poches repeated the *Miranda* rights again, telling Waloke that she did not have to speak with him and she could have a lawyer. Waloke said that she wanted to "get this out of the way" and continued to speak with the officers. She stated that she had an altercation with Jeunesse. Sergeant Poches asked Waloke if she was trying to defend herself. Waloke said that she didn't know. The first interview continued and Waloke described Jeunesse's behavior, which included yelling at Waloke, breaking glass and calling Waloke names. Sergeant Poches asked Waloke to explain how a knife ended up in her hands, and Waloke denied that there was a knife in her hands. Waloke eventually stopped responding to the officers and laid her head in her arms on the table. At 2:22 p.m., Sergeant Poches and Investigator Schultz left the room.

[¶10.]     Around 2:24 p.m., Officer Black came into the interrogation room to speak with Waloke. Waloke continued to say that she did not know what happened and was otherwise unresponsive to Officer Black. Investigator Schultz returned to the room about 12 minutes later and continued to question Waloke. Waloke remained unresponsive to questions. Rapid City Police Sergeant Matt Sargent, the case manager, came into the interrogation room at about 2:40 p.m. to try a different questioning technique, describing Waloke as the victim of Jeunesse. Waloke continued to be generally unresponsive to questions and stated that she wanted to go home and see her daughters. This interview concluded around 3:20 p.m. Then Waloke was processed for evidence. She had photographs taken of her injuries.

Law enforcement officials also took her clothing and collected other physical evidence. During processing, Officer Black told Waloke that she was being charged with murder.

[¶11.] Just before 5 p.m., Waloke asked to speak with Sergeant Sargent again. Sergeant Sargent read Waloke her *Miranda* rights and began the second interrogation. Waloke told Sergeant Sargent that she understood her *Miranda* rights and wished to speak with him. At this time, Waloke admitted to stabbing Jeunesse because Jeunesse was attacking her. Waloke stated that she was standing near the sink, grabbed a knife from a dish drainer, and used the knife to stab Jeunesse. After about an hour, Sergeant Sargent stopped the interview so that Waloke could eat and get some rest.

[¶12.] Around 7 a.m. on May 24, 2011, Sergeant Sargent and Sergeant Poches interviewed Waloke for the third time. Waloke was again advised of her *Miranda* rights and she agreed to waive those rights and speak with law enforcement. Waloke again discussed the verbal and physical altercation with Jeunesse. Waloke stated that she was swinging the knife at Jeunesse to keep Jeunesse away from her.

[¶13.] On May 25, 2011, the State filed a complaint charging Waloke with alternate counts of first degree murder, second degree murder, and manslaughter in the first degree. *See* SDCL 22-16-4(1), 22-16-7, and 22-16-15(3). Waloke made an initial appearance the same day. On June 2, 2011, a Pennington County Grand Jury issued an indictment charging Waloke with the same alternate counts as

charged in the earlier complaint. The trial court arraigned Waloke on June 27, 2011. Waloke entered a plea of not guilty to all of the charges in the indictment.

[¶14.]    On August 26, 2011, Waloke moved to suppress any statements that she made to Sergeant Poches, Investigator Schultz, Sergeant Sargent, and Officer Black on May 23, 2011. The trial court held pre-trial hearings on the motion on September 2 and 13, 2011. On October 11, 2011, Waloke moved to exclude any evidence, including video recordings, from the time she was placed in an interrogation room at the PSB until her first interrogation ended at approximately 3:20 p.m. on May 23, 2011. At another pre-trial hearing on October 27, 2011, the trial court orally denied both the motion to suppress evidence and the motion to exclude evidence. The trial court issued written findings of fact and conclusions of law on the motions to suppress and exclude evidence on January 23, 2012, *nunc pro tunc* to October 27, 2011.

[¶15.]    A jury trial began on November 3, 2011. On November 9, 2011, the jury returned a verdict of guilty on the charge of manslaughter in the first degree. On December 20, 2011, the trial court sentenced Waloke to 25 years in the South Dakota State Penitentiary with five years suspended.

[¶16.]    Waloke appeals. She raises three issues: (1) whether the trial court erred in denying her motion to suppress evidence and motion to exclude the evidence of the first interrogation; (2) whether the trial court erred in denying her request to instruct the jury on the lesser included offense of second degree manslaughter; and (3) whether the trial court erred in denying her request to instruct the jury on the elements of burglary.

## DISCUSSION

[¶17.]     **(1) Whether the trial court erred in denying Waloke's motion to suppress and motion to exclude the evidence of the first interrogation.**

[¶18.]     "We review a trial court's grant or denial of a motion to suppress alleged constitutional violations de novo." *State v. Cottier*, 2008 S.D. 79, ¶ 18, 755 N.W.2d 120, 128 (citing *State v. Johnson,* 2007 S.D. 86, ¶ 21, 739 N.W.2d 1, 8-9). "We give deference to pure fact findings on such questions as whether the proper warnings were actually given, but we review de novo a trial court's ruling on the question whether a defendant knowingly, intelligently, and voluntarily waived *Miranda* rights." *State v. Tuttle*, 2002 S.D. 94, ¶ 6, 650 N.W.2d 20, 25 (citing *State v. Stanga,* 2000 S.D. 129, ¶ 8, 617 N.W.2d 486, 488). "We review a trial court's evidentiary rulings under an abuse of discretion standard." *State v. Fisher*, 2011 S.D. 74, ¶ 32, 805 N.W.2d 571, 578 (citing *State v. Krebs,* 2006 S.D. 43, ¶ 26, 714 N.W.2d 91, 101).

[¶19.]     Waloke moved to suppress statements made in the first interrogation, claiming her lack of sleep and intoxication prevented her from knowingly, voluntarily, and intelligently waiving her right to remain silent and her right to counsel. She also moved to exclude the video of her first interrogation based on relevance grounds, arguing that she made no admission or confession during this interrogation and the only purpose in presenting the video of the first interrogation was prejudicial and not probative.

[¶20.]     "*Miranda* holds that '[t]he defendant may waive effectuation' of the rights conveyed in the warnings 'provided the waiver is made voluntarily,

knowingly and intelligently.'" *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 1140-41, 89 L. Ed. 2d 410 (1986) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966)). "To establish that a defendant waived [her] *Miranda* rights 'the State must show by a preponderance of the evidence that (1) the relinquishment of the defendant's rights was voluntary and (2) the defendant was fully aware that those rights were being waived and of the consequences of waiving them.'" *Cottier*, 2008 S.D. 79, ¶ 18, 755 N.W.2d at 128 (quoting *Tuttle*, 2002 S.D. 94, ¶ 9, 650 N.W.2d at 26). When considering whether a waiver was voluntarily, knowingly, and intelligently made, "a court should consider a defendant's age, experience, intelligence, and background, including familiarity with the criminal justice system, as well as physical and mental condition." *Tuttle*, 2002 S.D. 94, ¶ 7, 650 N.W.2d at 25-26 (footnote omitted) (citing *Fare v. Michael C.*, 442 U.S. 707, 724-25, 99 S. Ct. 2560, 2571-72, 61 L. Ed. 2d 197 (1979)). The trial court should consider "the effect the totality of the circumstances had upon the will of the defendant and whether that will was overborne." *State v. Gesinger*, 1997 S.D. 6, ¶ 12, 559 N.W.2d 549, 550 (citing *State v. Oltmanns*, 519 N.W.2d 602, 605 (S.D. 1994)).

[¶21.]     After reviewing the video of the first interrogation and hearing arguments from the State and Waloke, the trial court made oral findings on October 27, 2011, that Waloke knowingly, voluntarily, and intelligently waived her *Miranda* rights. The trial court found that Waloke had been awake much of the previous night, but after she was brought to the PSB, Waloke slept for two to three hours before the first interrogation. Waloke was 29 years old at the time of the interview

and had almost completed her bachelor's degree in education. Further, Waloke was fully advised of her rights and was provided with food, water, and bathroom breaks throughout the interview. The trial court also noted that Waloke did not challenge the second interrogation, which took place later in the afternoon after Waloke was processed for evidence, but before Waloke was able to sleep. The trial court found that Waloke had a limited criminal record. As to the issue of alcohol consumption, Waloke was not suffering from hallucinations or delusions, was not slurring her words and knew where she was. Waloke did misstate the date as May 21 instead of May 23. But, the trial court found that she knew that she was a suspect in the stabbing death of Jeunesse and provided identifying information about herself including her address, phone numbers, and social security number. Waloke did not make an unequivocal, unambiguous request to stop the questioning or invoke her right to remain silent. The trial court found that the first interview was relevant evidence because Waloke made statements in the first interview that were contradicted by some of her statements in the second and third interviews. The trial court concluded that considering the totality of the circumstances, the State met its burden of establishing by a preponderance of the evidence that Waloke made a knowing, voluntary, and intelligent waiver of her *Miranda* rights.

[¶22.] Based on the record, the trial court did not err in finding that the totality of the circumstances indicate that Waloke made a knowing, voluntary, and intelligent waiver of her *Miranda* rights in the first interrogation. Sergeant Poches advised Waloke of her right to remain silent, her right to counsel, her right to stop questioning at any time, and that any statements she made could be used against

her. Waloke answered affirmatively when asked if she understood her rights. Waloke had nearly completed her bachelor's degree at the time of the interrogation. She was offered water, food, and bathroom breaks during the interrogation. The first interrogation lasted for nearly three hours, but included breaks throughout the questioning. Waloke slept between two and three hours prior to questioning by the officers. She was able to provide identifying information about herself including her address, phone numbers, and social security number. She responded to questions by law enforcement officers throughout the interview, but later during the interview became less responsive to officers' questions and told Sergeant Poches and Investigator Schultz that she wanted to go home and that she was tired.

[¶23.] Waloke argues that her waiver of her *Miranda* rights was not voluntary because she slept little during the night before the interrogation and was intoxicated during the interrogation. We have previously held that "'[c]ustodial statements made by an intoxicated defendant are not per se involuntary, but rather this is one of the circumstances to be considered by the trial judge in [the] determination of voluntariness.'" *State v. Gregg*, 405 N.W.2d 49, 53 (S.D. 1987) (quoting *State v. Neville,* 312 N.W.2d 723, 727 (S.D. 1981), *rev'd on other grounds*, 459 U.S. 553, 103 S. Ct. 916, 74 L. Ed. 2d 748 (1983)).

[¶24.] Further, Waloke's statements that she wanted to go home or that officers should just take her to jail were not unequivocal or unambiguous requests to stop the interrogation. Waloke did not say that she wanted to remain silent or did not want to speak with police anymore. "Had [she] made either of these simple, unambiguous statements, [she] would have invoked [her] 'right to cut off

questioning.'" *Berghuis v. Thompkins*, 560 U.S. 370, __, 130 S. Ct. 2250, 2260, 176 L. Ed. 2d 1098 (2010) (quoting *Michigan v. Mosley,* 423 U.S. 96, 103, 96 S. Ct. 321, 326, 46 L. Ed. 2d 313 (1975)).  "Here [she] did neither, so [she] did not invoke [her] right to remain silent."  *Id.*  Thus, Waloke waived her *Miranda* rights and the trial court did not err in denying the suppression motion.

[¶25.]     Waloke also argues that the video of the first interrogation should be excluded because the probative value of the evidence is outweighed by the prejudicial effect.  Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  SDCL 19-12-1 (Rule 401).  A trial court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  SDCL 19-12-3 (Rule 403).  "The party objecting to the admission of evidence has the burden of showing the probative value of the evidence is substantially outweighed by its prejudicial effect."  *Fisher*, 2011 S.D. 74, ¶ 33, 805 N.W.2d at 578 (citing *St. John v. Peterson*, 2011 S.D. 58, ¶ 16, 804 N.W.2d 71, 76).

[¶26.]     During the first interrogation of Waloke, she denied knowing what happened the night before, she denied stabbing Jeunesse, and she did not claim self-defense.  Waloke argues that showing the first interrogation made a terrible impression and was used by the State to detract from Waloke's theory of self-defense.  The first interrogation was relevant and probative because Waloke made

statements inconsistent with her subsequent interrogations and the first interrogation was relevant to her credibility as a witness. The State used the first interrogation to counter Waloke's claims of self-defense. Waloke failed to establish that the prejudicial effect of the evidence substantially outweighed its probative value. Thus, we cannot say that the trial court abused its discretion in admitting the video of the first interrogation.

[¶27.] **(2) Whether the trial court erred in denying Waloke's request to instruct the jury on the lesser included offense of second degree manslaughter.**

[¶28.] In general, we "'review a trial court's decision to grant or deny a particular instruction under the abuse of discretion standard.'" *State v. Roach*, 2012 S.D. 91, ¶ 13, 825 N.W.2d 258, 263 (quoting *State v. Klaudt*, 2009 S.D. 71, ¶ 13, 772 N.W.2d 117, 121). We have also stated that "'an accused must be afforded a meaningful opportunity to present a complete defense. When a defendant's theory is supported by law and . . . has some foundation in the evidence, however tenuous, the defendant has a right to present it.'" *Id.* (quoting *Klaudt*, 2009 S.D. 71, ¶ 13, 772 N.W.2d at 121). "'Nonetheless, jury instructions are to be considered as a whole, and if the instructions when so read correctly state the law and inform the jury, they are sufficient. This is a question of law reviewed de novo.'" *Id.* (quoting *Klaudt*, 2009 S.D. 71, ¶ 13, 772 N.W.2d at 121).

[¶29.] The history of this Court's treatment of lesser included offense instructions in murder and manslaughter cases is traced in *State v. Black (Black I)*, 494 N.W.2d 377 (S.D. 1993) and *State v. Black (Black II)*, 506 N.W.2d 738 (S.D. 1993). *See also* Tim Dallas Tucker, *State v. Black: Confusion in South Dakota's*

*Determination of Lesser Included Offenses in Homicide Cases*, 41 S.D. L. Rev. 464 (1996). In his article discussing South Dakota's approach to lesser included offenses in homicide cases, Judge Tucker opined that "[t]he elements test is difficult to use under South Dakota's current homicide statutory scheme, but it is workable if different intent or state of mind elements are accepted as lesser elements." 41 S.D. L. Rev. at 496. In 2002, we abandoned our earlier tests and stated that "[a] lesser-included-offense instruction should be given when (1) the elements test is met and (2) some evidence in support of such instructions exists in the record." *State v. Hoadley*, 2002 S.D. 109, ¶ 64, 651 N.W.2d 249, 264 (footnote omitted). The elements test is met if

> (1) all of the elements of the included offense are lesser in number than the elements of the greater offense; (2) the penalty for the included lesser offense must be less than that of the greater offense; and (3) both offenses must contain common elements so that the greater offense cannot be committed without also committing the lesser offense.

*Id.* ¶ 61, 651 N.W.2d at 263 (quoting *Black I*, 494 N.W.2d at 379). In *State v. Giroux,* we concluded "that when determining whether a crime is a lesser-included-offense, the degrees of intent, that is, the degrees of culpability should be considered." 2004 S.D. 24, ¶ 10, 676 N.W.2d 139, 143. The defendant's degree of culpability should be considered when evaluating the third component of the elements test, wherein "both the greater and lesser offense . . . have common elements 'so that the greater offense cannot be committed without also committing the lesser offense.'" *Id.* ¶ 14, 676 N.W.2d at 144 (quoting *Hoadley* 2002 S.D. 109, ¶ 61, 651 N.W.2d at 263). In 2005, the Legislature validated this approach and simplified the application of the elements test in homicide cases by codifying the

possible lesser included offenses for various degrees of murder and manslaughter.

SDCL 22-16-20.1.[1] The Legislature also codified the requirement that a trial court

conduct a factual analysis before a lesser included offense instruction is given to the

jury. SDCL 22-16-20.2.[2]

[¶30.] "Manslaughter in the second degree is a lesser included offense of

murder in the first degree, murder in the second degree, and manslaughter in the

first degree." SDCL 22-16-20.1. As Waloke was charged in the alternative with

murder in the first degree, murder in the second degree, and manslaughter in the

first degree, she had a right to *request* a lesser included offense instruction under

SDCL 22-16-20.2. "A lesser included offense instruction shall be given at any

homicide trial whenever any facts are submitted to the trier of fact which would

support such an offense pursuant to this chapter." SDCL 22-16-20.2. The trial

court's remaining task is to consider "whether there [is] *some* evidence to support

---

1.    SDCL 22-16-20.1 provides:
           Murder in the second degree is a lesser included offense of
           murder in the first degree. Manslaughter in the first degree is a
           lesser included offense of murder in the first degree and murder
           in the second degree. Manslaughter in the second degree is a
           lesser included offense of murder in the first degree, murder in
           the second degree, and manslaughter in the first degree.

2.    SDCL 22-16-20.2 provides:
           A lesser included offense instruction shall be given at any
           homicide trial whenever any facts are submitted to the trier of
           fact which would support such an offense pursuant to this
           chapter. The state and the defendant each have the separate
           right to request a lesser included offense instruction. The
           failure to request a lesser included offense instruction
           constitutes a waiver of the right to such an instruction.

giving the instruction." *Hoadley*, 2002 S.D. 109, ¶ 64, 651 N.W.2d at 264. But "[t]he question is *not* . . . whether there was *sufficient* evidence." *Id.* ¶ 64 n.14.

[¶31.] Waloke was charged with manslaughter in the first degree under SDCL 22-16-15(3), which specifies that "[h]omicide is manslaughter in the first degree if perpetrated . . . [w]ithout any design to effect death, including an unborn child, but by means of a dangerous weapon[.]" In contrast, manslaughter in the second degree is "*[a]ny reckless killing* of one human being, including an unborn child, by the act or procurement of another which, under the provisions of this chapter, *is neither murder nor manslaughter in the first degree*, nor excusable nor justifiable homicide[.]" SDCL 22-16-20 (emphasis added). SDCL 22-1-2(1)(d) defines "reckless" or "recklessly." The statute provides:

> The words, "reckless, recklessly," and all derivatives thereof, import a conscious and unjustifiable disregard of a substantial risk that the offender's conduct may cause a certain result or may be of a certain nature. A person is reckless with respect to circumstances if that person consciously and unjustifiably disregards a substantial risk that such circumstances may exist[.]

SDCL 22-1-2(1)(d).

[¶32.] Though SDCL 22-16-20.1 provides that manslaughter in the second degree is a lesser included offense of murder in the first degree, murder in the second degree, and manslaughter in the first degree, SDCL 22-16-20.2 requires the trial court to complete a factual analysis before granting a requested instruction on a lesser included offense. It is undisputed that Waloke stabbed Jeunesse with a knife. It is also undisputed that Jeunesse died because of the knife stab wound to her chest. Because there is no evidence that Waloke acted recklessly, the

circumstances in this case do not meet the factual test necessary to support an instruction on manslaughter in the second degree. Thus, the trial court did not err in refusing to instruct the jury on the lesser offense of manslaughter in the second degree.

[¶33.] **(3) Whether the trial court erred in denying Waloke's request to instruct the jury on the elements of burglary.**

[¶34.] Again, we review the trial court's decision to grant or deny an individual instruction for abuse of discretion, but we consider as a question of law whether the jury instructions in their entirety state the law correctly. *See Roach*, 2012 S.D. 91, ¶ 13, 825 N.W.2d at 263.

[¶35.] Waloke requested that the jury be instructed on the elements of burglary in order to clarify the instruction on justifiable homicide. The instruction given on justifiable homicide, Instruction Number 31, stated:

> A homicide is justifiable if committed by any person in the lawful defense of such person when there is reasonable ground to apprehend a design to commit a felony, or to do some great personal injury; and imminent danger of such design being accomplished.
>
> The defendant, however, must have acted upon an honest and reasonable conviction of necessity and a good faith belief that the decedent intended to kill or seriously injure her. The defendant having such an honest and reasonable apprehension of such danger may act to defend herself in such manner and with such means as may seem to her reasonably necessary in view of the circumstances. The kind and degree of force which a person may lawfully use in defense of herself is limited by what a reasonable person in the same situation as such person, seeing what the defendant sees and knowing what the defendant knows, then would believe to be necessary. Any use of force beyond that is regarded by the law as excessive. Although a person may believe that the defendant is acting in defense of herself, the defendant is not justified in using a degree of force clearly in excess of that apparently and reasonably necessary

under the existing facts and circumstances. When self-defense is raised as an issue by evidence showing the same, whether produced by the defendant or state, the burden of proving that the defendant did not act in self-defense rests upon the state to prove so beyond a reasonable doubt.

Waloke argued that Jeunesse was committing burglary in Waloke's home and this justified Waloke's actions toward Jeunesse. Waloke proposed a separate instruction defining "felony" as "burglary" to give meaning to Instruction Number 31. *See* SDCL 22-32-1.[3] The trial court denied the instruction specifically defining burglary after considering *State v. Pellegrino*, 1998 S.D. 39, 577 N.W.2d 590, where this Court affirmed a trial court's decision not to include "burglary" when defining "any felony" in jury instructions. In *Pellegrino*, the Court stated:

[p]ersons in their own homes assaulted or placed in apparent imminent danger of great personal injury, have the right to stand their ground and meet force with force, even to the extent of taking life if such persons actually believe, and the circumstances and surrounding conditions are such that a reasonably cautious and prudent person would believe, danger of death or great personal injury to be imminent at the hands of the assailant.

1998 S.D. 39, ¶ 16, 577 N.W.2d at 596-97 (citations omitted). *See also* SDCL 22-16-34 ("Homicide is justifiable if committed by any person while resisting any attempt

---

3.    SDCL 22-32-1 defines burglary:
Any person who enters or remains in an occupied structure, with intent to commit any crime, unless the premises are, at the time, open to the public or the person is licensed or privileged to enter or remain, is guilty of first degree burglary if:
(1) The offender inflicts, or attempts or threatens to inflict, physical harm on another;
(2) The offender is armed with a dangerous weapon; or
(3) The offense is committed in the nighttime.
First degree burglary is a Class 2 felony.

to murder such person, or to commit any felony upon him or her, or upon or in any dwelling house in which such person is."). In *Pellegrino*, the trial court gave a jury instruction on justifiable homicide and qualified that instruction by explaining that "any felony" included aggravated assault and kidnapping, which were also defined in the instructions. *Id.* ¶ 17, 577 N.W.2d at 597. Pellegrino requested that the trial court also include "burglary" as an example of a felony, along with aggravated assault and kidnapping, and argued that the victim committed burglary by entering and remaining in Pellegrino's home prior to the altercation that led to the victim's death. *Id.* ¶ 12-13, 577 N.W.2d at 595-96. The trial court did not include "burglary" in the instructions because of the particular facts of the case. We concluded that it was within the trial court's discretion to decline to instruct on burglary because of the facts of the case, though "ordinarily burglary should be included within this description, if for no other reason than by legislative fiat it is a crime of violence in some instances[.]" *Id.* ¶ 17, 577 N.W.2d at 597 (citations omitted).

[¶36.] Here, the trial court found that Waloke's proposed instruction was not the standard for self-defense in South Dakota and that Instruction Number 31 properly reflected the state of the law. Also, unlike in *Pellegrino*, the trial court did not modify the justifiable homicide instruction to include examples of felonies. Here, the trial court found that the instruction properly stated that the homicide could only be justified if the decedent was committing or attempting to commit a felony and the defendant believed "that the decedent intended to kill or seriously injure her."

[¶37.] The trial court's denial of the burglary instruction was not an abuse of discretion. Instruction Number 31 accurately reflected the state of justifiable homicide law in South Dakota: if a person is committing a felony against the defendant and the defendant "acted upon an honest and reasonable conviction of necessity and a good faith belief that the decedent intended to kill or seriously injure her," then the defendant may use a kind and degree of force that is necessary.

[¶38.] The State had the burden to prove beyond a reasonable doubt that Waloke did not act in self-defense, and the jury instructions properly reflected this burden. *See Pellegrino*, 1998 S.D. 39, ¶ 19, 577 N.W.2d at 598. The jurors had the opportunity to consider that Waloke acted in self-defense if they believed that Jeunesse assaulted Waloke or attempted to cause her great personal injury. The jurors heard testimony from Waloke about her fear of Jeunesse and the altercation between the two women before Jeunesse's death. The jury could have determined that Waloke's belief that Jeunesse intended to seriously injure or kill her was unreasonable. Even if the jury concluded that Waloke's belief was reasonable, they could have reasoned that the kind and degree of force used by Waloke was unreasonable.

[¶39.] As in *Pellegrino*, under the facts in this case, it was within the trial court's discretion to not instruct on the elements of burglary in order to clarify the instruction given on justifiable homicide.

**CONCLUSION**

[¶40.] The trial court did not abuse its discretion in denying the motion to suppress and in admitting the video of the first interrogation. The trial court did

not err in refusing to instruct the jury on the lesser offense of manslaughter in the second degree. Finally, the trial court did not err in denying a jury instruction on burglary and allowed Waloke's counsel to appropriately argue the elements of justifiable homicide. We affirm.

[¶41.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, and WILBUR, Justices, concur.