#28584-a-JMK
**2019 S.D. 55**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

DONALD M. WILLINGHAM,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE WALLY EKLUND
Retired Judge

* * * *

MARTY J. JACKLEY
Attorney General

PATRICIA ARCHER
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                                        and appellee.


SHILOH M. MACNALLY
Rapid City, South Dakota                Attorney for defendant
                                        and appellant.

* * * *

CONSIDERED ON BRIEFS
ON MARCH 25, 2019
OPINION FILED **09/11/19**

#28584

KERN, Justice

[¶1.]        Donald Willingham appeals convictions of attempted first-degree murder, aggravated assault on a law enforcement officer, possession of marijuana with the intent to distribute, possession of marijuana, and commission of a felony with a firearm.  He argues the circuit court erred by denying his motions to suppress and abused its discretion by denying his proposed jury instructions on lesser-included offenses.  We affirm.

## Facts and Procedural History

[¶2.]        On the morning of October 24, 2015, while patrolling I-90 east of Rapid City, South Dakota, Trooper Zac Bader observed a Suburban traveling 75 miles per hour in a 65 mile-per-hour zone.  He turned on his emergency lights, which activated his forward-facing dash camera, and pulled the vehicle over.  The driver of the Suburban stopped the vehicle on the shoulder of the road near mile marker 70.

[¶3.]        When Trooper Bader approached the passenger side of the vehicle, he immediately smelled a strong odor of marijuana coming from inside the Suburban. He requested that the driver, later identified as Chase Sukert, accompany him back to his patrol car.  While issuing Chase a warning ticket for speeding, Trooper Bader commented that Chase and the interior of the Suburban smelled like marijuana. He left Chase in his patrol car and approached the vehicle again.

[¶4.]        Trooper Bader instructed the three passengers—later identified as Donald Willingham, Jonathan Melendez, and Desiree Sukert (Chase's sister)—to exit the Suburban and stand in the ditch while he searched the vehicle for marijuana.  After finding a black duffel bag containing packages of marijuana,

Trooper Bader turned toward the ditch to place the suspects under arrest. As he approached them, he walked outside the range of his dash camera.

[¶5.] Addressing Willingham first, Trooper Bader told him to put his hands behind his back. Instead of complying, Willingham, a six-foot tall, 270-pound former semi-pro football player, advanced on Trooper Bader and punched him in the face, knocking him to the ground. While delivering forceful blows to Trooper Bader's face, Willingham began yelling "go, go, go!" to the others. At his command, Desiree jumped into the driver's seat of the Suburban and Melendez and Chase followed. Meanwhile, Willingham continued to beat Trooper Bader, telling him to "go to sleep" twice as he delivered his final punches.

[¶6.] Willingham, Melendez, Desiree, and Chase fled the crime scene, leaving Trooper Bader, who was struggling to breathe and unable to move, lying in a pool of blood by the side of the road. When first responders arrived to render aid, he was barely conscious. It soon became clear that Trooper Bader was suffering from extensive, life-threatening injuries. Nearly every bone on the left side of his face (including his jaw) was broken, he was bleeding profusely, and he had severe swelling. He was rushed to the hospital for treatment and surgery.

[¶7.] In the meantime, Willingham, Chase, Desiree, and Melendez decided to hide approximately fifty pounds of marijuana and a .380 caliber hand gun in a pasture next to a nearby country road. Before they left the field, Chase took a photo of the location on his phone so that they could relocate their stash. After disposing of the evidence, they drove to a motel in Wall. Willingham, Chase, and Desiree remained in the vehicle while Melendez went inside to rent a room.

[¶8.]      Around the same time, Deputy Sheriff Dan Rose, heard radio broadcasts describing the suspects' vehicle and pulled into a gas station to fill up his tank.  While at the pump, he noticed a Suburban matching the description in the parking lot of a motel.  He called for backup.  With the help of two United States Forest Service Officers, Deputy Rose approached the Suburban and ordered the suspects out of the car.  Willingham got out with his hands in the air, one of which was wrapped in a towel with ice, saying, "I did it.  I did it.  It was just me.  No one else was involved."  All four individuals were taken into custody.  Law enforcement officers searched the vehicle and found $30,000 cash inside.

[¶9.]      An officer called an ambulance to address Willingham's injured hand.  While waiting for medical professionals, Willingham repeatedly told Officer Eric Nelson that he assaulted the officer.  Although Officer Nelson was not questioning Willingham, he informed him that it was in his best interest to remain silent.  Willingham ignored this advice and made further statements to the officers guarding him while riding in the ambulance and at the hospital.  When paramedics asked whether he was under the influence of any drugs, Willingham said he had smoked marijuana earlier in the day and had taken a Vicodin tablet.  After diagnosing him with a broken hand, Willingham's doctor administered pain medication to him.

[¶10.]      Once Willingham received treatment, officers transported him to the Criminal Investigations Division (CID) for questioning.  At approximately 7:40 p.m., Willingham was advised of his *Miranda* rights and orally waived them.  He spoke to Investigator Paul Stevens and Detective Stephen Neavill for nearly an hour before

invoking his right to remain silent. At his request, law enforcement ceased questioning him and ended the interview shortly thereafter. However, even though he had asserted his right to remain silent, Willingham engaged in conversation with a sergeant while being transported to the jail.

[¶11.] Later that evening, officers located the gun and marijuana in a field along I-90 by referencing the photo Chase had taken earlier in the day. The following afternoon, a detective contacted Willingham at the jail and asked if he wanted to talk. Willingham agreed to a second interview and was taken back to the CID. At 3:30 p.m., officers again read him his *Miranda* rights, which he waived. Willingham made several incriminating statements regarding the assault and discussed his role in transporting the marijuana through South Dakota. He also admitted to carrying a gun, which he transported in the Suburban with the drugs and money.

[¶12.] Due to swift and extensive medical attention that involved several surgeries and a prolonged stay in the hospital, Trooper Bader survived the attack. A Pennington County grand jury indicted Willingham for attempted first-degree murder, alternative counts of aggravated assault on a law enforcement officer, possession of marijuana with the intent to distribute, possession of marijuana, and commission of a felony with a firearm.[1]

[¶13.] Prior to trial, Willingham filed three motions to suppress his statements to law enforcement. He also moved to suppress evidence derivative of

---

1. Each of Willingham's three co-defendants pled guilty to possession of marijuana with the intent to distribute and accessory to a crime after the fact.

his arrest, arguing that Trooper Bader engaged in racial profiling as the basis for the traffic stop. According to defense counsel, although the driver of the vehicle (Chase) is Caucasian, Willingham, the back-seat passenger, is African American and Melendez is Hispanic. The Suburban had tinted windows.

[¶14.] To address these claims, the court held two evidentiary hearings. At the first hearing, the parties stipulated to the admission of Trooper Bader's patrol camera video for the court's review with reference to Willingham's motion challenging the legality of the stop. The State also called several law enforcement officials to testify about the statements made by Willingham after his arrest. The State also entered the recordings of Willingham's interviews into evidence.

[¶15.] Officer Nelson testified regarding his role in arresting Willingham outside the motel in Wall. He described Willingham's hand injury and the incriminating statements he made despite being advised to remain silent. Deputy Daniel Lewis detailed his experience with Willingham while guarding him at Rapid City Regional Hospital. Deputy Lewis testified that Willingham made several unsolicited statements to him—including, "I hit him too many times" and, "I hate when I fight. I can't stop"—which he recorded in his report. Investigator Paul Stevens, who was present during both of Willingham's interviews described Willingham's conduct during the interviews and recounted the statements Willingham made.

[¶16.] At the second evidentiary hearing, Sergeant Chris Hislip testified about his encounter with Willingham while transporting him from the CID to the Pennington County Jail for booking. He narrated Willingham's statements about

his fear that jail personnel and the police would not "treat him nicely" because he assaulted an officer. Sergeant Hislip stated that he assured Willingham he would not be assaulted but never questioned him.

[¶17.] After considering the evidence and oral arguments of the parties, the circuit court issued a memorandum decision denying Willingham's motions to suppress his statements. The court also denied his motion to suppress the evidence seized as a result of the stop, finding that Trooper Bader "had a reasonable articulable suspicion to initiate a traffic stop" for speeding.

[¶18.] During the three-day jury trial held in December 2017, twenty-two witnesses testified, including Melendez, who testified against Willingham as a condition of his plea agreement. Trooper Bader, who was still recovering from his injuries, also took the stand. At the close of the evidence, Willingham requested the court give the jury two lesser-included offense instructions for the greater offense of commission of a felony with a firearm—one for carrying a pistol or revolver without a permit and the other for concealment of a weapon with intent to commit a felony. The court did not give either instruction.

[¶19.] The jury found Willingham guilty of attempted first-degree murder, aggravated assault on a law enforcement officer, possession of marijuana with the intent to distribute, possession of marijuana, and commission of a felony with a firearm. The circuit court sentenced Willingham to 45 years in the penitentiary, imposed significant fines, and ordered $146,277.98 in restitution.

[¶20.]     Willingham appeals his conviction.  We restate his issues as follows:

> 1.  Whether the circuit court erred in denying Willingham's motions to suppress evidence discovered as a result of the traffic stop.
>
> 2.  Whether the circuit court erred by denying Willingham's motions to suppress statements.
>
> 3.  Whether the circuit court erred by rejecting Willingham's lesser-included offense instructions.

## Standard of Review

[¶21.]     We review "the denial of a motion to suppress based on the alleged violation of a constitutionally protected right as a question of law by applying the de novo standard of review."  *State v. Rolfe*, 2018 S.D. 86, ¶ 10, 921 N.W.2d 706, 709.  However, "[w]e review the circuit court's factual findings for clear error."  *Id.* ¶ 10, 921 N.W.2d at 709–10.

[¶22.]     "[W]e review *de novo* a [circuit] court's ruling on the question whether a defendant knowingly, intelligently, and voluntarily waived *Miranda* rights."  *State v. Tuttle,* 2002 S.D. 94, ¶ 6, 650 N.W.2d 20, 25.  The burden is on the State to prove the defendant's admissions were voluntary by a preponderance of the evidence.  *State v. Ralios*, 2010 S.D. 43, ¶ 24, 783 N.W.2d 647, 654.

[¶23.]     Generally, "we review a [circuit] court's decision to grant or deny a particular instruction under the abuse of discretion standard."  *State v. Waloke*, 2013 S.D. 55, ¶ 28, 835 N.W.2d 105, 112–13.  However, when the issue requires this Court to analyze the elements of the given offenses, this is a question of law reviewed de novo.  *State v. McCahren*, 2016 S.D. 34, ¶ 5, 878 N.W.2d 586, 590; *State v. Giroux*, 2004 S.D. 24, ¶ 4, 676 N.W.2d 139, 140–41.

**Analysis and Decision**

1.     **Whether the circuit court erred in denying Willingham's motions to suppress evidence discovered as a result of the traffic stop.**

[¶24.]     On appeal, Willingham argues that all evidence seized as a result of the traffic stop should be suppressed because Trooper Bader unconstitutionally extended the stop beyond the time necessary to issue the warning ticket for speeding in order to ask drug interdiction questions. Additionally, Willingham asserts that the circuit court erred because it did not enter findings of fact and conclusions of law in ruling on his motion to suppress evidence on this issue.

[¶25.]     However, Willingham did not advance his argument that the duration of the stop was unlawful before the circuit court, instead challenging the stop only on a theory of racial profiling. By failing to bring this claim before the trial court, Willingham failed to preserve the argument for our review. *See State v. DuFault*, 2001 S.D. 66, ¶ 7, 628 N.W.2d 755, 757. Issues not raised before the circuit court cannot ordinarily be raised for the first time on appeal. *State v. Henjum*, 1996 S.D. 7, ¶ 13, 542 N.W.2d 760, 763. Although, "[o]rdinarily we would review a forfeited claim such as this for plain error[,]" because "neither party has identified plain error as the correct standard of review, we decline to apply it *sua sponte* in this case." *State v. Roedder*, 2019 S.D. 9, ¶ 11 n.2, 923 N.W.2d 537, 542 n.2. Therefore, Willingham has "waive[d] the issue before this Court." *See DuFault*, 2001 S.D. 66, ¶¶ 7-8, 628 N.W.2d at 757.

[¶26.]     Moreover, even if Willingham's claims were not waived, the relief he seeks is not available.  As we understand Willingham's argument to "quash" his arrest and "suppress evidence derivative thereof[,]" his request relates exclusively to evidence associated with his assault of Trooper Bader.[2]  Although Bader's attempt to arrest Willingham was not illegal, we have held that a defendant may not resist an arrest even if it is unlawful.  *State v. Miskimins*, 435 N.W.2d 217, 221 (S.D. 1989) (quoting *State v. Wick*, 331 N.W.2d 769, 771 (Minn. 1983)).

[¶27.]     In *Miskimins*, we aligned our view with other state and federal courts which generally hold that a defendant who reacts to an arrest, even if it is unlawful, by committing a new and distinct criminal act may not seek the remedy of exclusion.  *See id.* at 220–21.  This rule is pragmatic and sensible, and "[t]o [hold] otherwise would allow a defendant carte blanche authority to go on whatever criminal rampage he desired and do so with virtual legal impunity as long as such actions stemmed from the chain of causation started by the police misconduct, be it minor or major."  *Id.* at 221.  Because the remedy of exclusion is not available to Willingham, his unrelated claim that the circuit court did not issue findings of fact and conclusions of law when it denied his now-abandoned theory of racial profiling, does not impact our review.

---

2.     We do not interpret Willingham's suppression argument to implicate other evidence because, so far as we can discern from the record, Trooper Bader did not seize any evidence prior to the assault.  He did observe the bag of marijuana, but this observation was unconnected with its eventual discovery and seizure which was based instead upon photographic evidence from Chase's phone discovered independently by officers after his arrest.

**2. Whether the circuit court erred by denying
Willingham's motions to suppress statements.**

[¶28.] Next, Willingham challenges the denial of his motions to suppress his statements by arguing: (1) his statements prior to his custodial interview were involuntary; (2) he was not adequately advised of his *Miranda* rights; and (3) law enforcement did not honor his right to remain silent.

*Statements made prior to custodial interview*

[¶29.] Willingham argues the statements he made to police after arrest, during the ambulance ride, and at the hospital were involuntary because he was in pain, in shock, and under the influence of narcotics. Although he initially briefed the circuit court on the issue, his counsel later conceded that his primary authority, *Mincey v. Arizona*, involved injuries "different than the case here," and he was therefore "abandoning that issue."[3] *See* 437 U.S. 385, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978). Because Willingham waived his argument that he was in pain and shock from his injuries, we will not consider this portion of his claim. *See Rosales-Mireles v. United States*, __ U.S __, 138 S. Ct. 1897, 1905, 201 L. Ed. 2d 376 (2018).

[¶30.] Before considering the remaining portion of his argument that the statements he made prior to his formal interview were involuntary due to the influence of narcotics, we begin by examining his custodial status. "When a person is in the custody of law enforcement and law enforcement intends to perform a

---

3. The defendant's injuries in *Mincey* were much more extensive than Willingham's injury. In *Mincey*, the defendant was seriously wounded a few hours before the interrogation, was in the intensive care unit in unbearable pain during the interview, encumbered by medical apparatus, and slipping in and out of consciousness. *Mincey v. Arizona*, 437 U.S. 385, 398–99, 98 S. Ct. 2408, 2416–17, 57 L. Ed. 2d (1978).

custodial interrogation of that person, they are required to read them their *Miranda* rights." *State v. Lewandowski*, 2019 S.D. 2, ¶ 20, 921 N.W.2d 915, 920. "[T]he definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 302, 100 S. Ct. 1682, 1690, 64 L. Ed. 2d 297 (1980) (emphasis in original). In contrast, "[u]ncoerced, voluntary, and spontaneous statements are not protected by *Miranda*." *Lewandowski*, 2019 S.D. 2, ¶ 22, 921 N.W.2d at 921. Willingham, although under arrest and in custody, was not interrogated by officers until transported to the CID for questioning.

[¶31.]    In *Lewandowski*, we addressed a similar set of circumstances. The defendant was in custody and taken to a hospital to be treated for Taser injuries. *Id.* ¶ 11, 921 N.W.2d at 919. When an officer entered the defendant's hospital room and informed him that he wished to speak with him, the defendant began making statements such as, "I'm sorry, sorry man," and, "I done a bad thing," before the officer read him his *Miranda* rights. *Id.* The officer indicated to the defendant that he should wait to begin speaking about the crime until others left the hospital room. *Id.* ¶ 22, 921 N.W.2d at 921. After the room was cleared, the officer read the defendant his *Miranda* rights and interrogated him. *Id.* ¶ 11, 921 N.W.2d at 919. We determined that statements the defendant made after he was arrested but prior to the officer reading him his *Miranda* rights, were not made in response to any questions posed by law enforcement; rather the statements were uncoerced and voluntary. *Id.* ¶ 22, 921 N.W.2d at 921.

[¶32.]     In this instance, no evidence suggests that the officers provoked Willingham into speaking or that they initiated conversations with him designed to elicit incriminating statements. On the contrary, Officer Nelson informed Willingham shortly after his arrest and prior to his custodial interview that he may wish to remain silent. Willingham disregarded this advice and made numerous statements that were entirely self-generated and voluntary.

[¶33.]     We find equally unavailing Willingham's argument that taking a Vicodin pill for pain and ingesting marijuana rendered his statements involuntary. As noted, *Miranda* warnings do not preclude the admission of statements made voluntarily outside of custodial interrogation. *Id.* Here, the record indicates that Willingham's intoxication, if any, did not impair his ability to speak voluntarily and of his own free will. Moreover, several officers contradicted Willingham's assertion of intoxication by testifying that Willingham was cognizant of his surroundings, "act[ed] normally," and did not appear to be under the influence during his arrest and at the hospital. Therefore, we affirm the circuit court's denial of Willingham's motion to suppress.

### *Adequacy of Miranda warnings*

[¶34.]     Willingham next argues the *Miranda* warnings he received prior to his interviews at the CID were inadequate because law enforcement did not insert the phrase "in a court of law" into the advisement. This omission, in Willingham's view, requires suppression of all statements made during both interviews. In *Miranda v. Arizona*, the United States Supreme Court held that a criminal defendant must be advised of certain safeguards before custodial interviews. 384 U.S. 436, 444, 86 S.

Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966). Law enforcement's advisement prior to a

custodial interview should include the following:

> He must be warned prior to any questioning that he has the
> right to remain silent, that anything he says can be used against
> him in a court of law, that he has the right to the presence of an
> attorney, and that if he cannot afford an attorney one will be
> appointed for him prior to any questioning if he so desires.

*Id.* at 479, 86 S. Ct. at 1630.

[¶35.]        Yet *Miranda* warnings need not "be given in the exact form described

in that decision." *State v. Rhines*, 1996 S.D. 55, ¶ 12, 548 N.W.2d 415, 426. This is

because "the words of *Miranda* do not constitute a ritualistic formula which must be

repeated without variation in order to be effective. Words which convey the

substance of the warning along with the required information are sufficient." *Evans*

*v. Swenson*, 455 F.2d 291, 295 (8th Cir. 1972).

[¶36.]        Prior to each custodial interview, law enforcement used a pre-printed

*Miranda* warning card to inform Willingham:

> You have a continued right to remain silent and to stop
> questioning at any time. Anything you say can be used as
> evidence against you. You have the continuing right to consult
> with and have the presence of an attorney and if you cannot
> afford an attorney, an attorney will be appointed for you.

Even though Willingham was not advised that evidence could be used against him

*in a court of law*, this fact alone is insufficient to invalidate his *Miranda* warnings.

Law enforcement included "[t]he substance of the warning along with the required

information" by informing him he had the right to remain silent; his statements

could be used against him; he had the right to an attorney; and one would be

appointed to him if he could not afford an attorney. *Rhines*, 1996 S.D. 55, ¶ 12, 548

N.W.2d at 426.  Therefore, Willingham's *Miranda* warnings were accurate and adequate.

### *Invocation of his right to remain silent*

[¶37.]        As his final argument that his statements should be suppressed, Willingham claims that although he invoked his right to remain silent at the end of his first interview, the officers continued speaking to him and returned the next day for a second interview.  By not promptly ending all further questioning after the invocation of his right, Willingham argues all subsequent statements must be suppressed.

[¶38.]        The Supreme Court has unequivocally stated that "the admissibility of statements obtained after the person in custody has decided to remain silent depends . . . on whether his 'right to cut off questioning' was scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S. Ct. 321, 326, 46 L. Ed. 2d 313 (1975).  To determine whether police have "scrupulously honored" a suspect's invocation of his right to remain silent, we examine: whether police immediately ended the interrogation; whether there was a significant passage of time before questioning was resumed accompanied by fresh *Miranda* warnings; and whether the subject matter of the second interrogation concerned a crime different than the subject of the prior interrogation.  *Id*. at 106, 96 S. Ct. 327; *Hatley v. Lockhart*, 990 F.2d 1070, 1073-74 (8th Cir. 1993).

[¶39.]        During the first interview, after Willingham made several incriminating statements regarding his role in the crimes, he began to disagree

-14-

with the officers about whether he delivered marijuana in Wyoming. At that point,

he decided to end the interview stating:

> **Willingham:** I don't wanna talk no more. That's a lie, that's a lie, that's a lie, that is a lie. I did not do sell no drugs in fucking Wyoming.
>
> **Detective Neavill:** And just so you know what you did today, there are so many factures in [Bader's] face the doctors can't even count them. He's injured to the point where he can't even breathe on his own. That's what YOU did!
>
> **Investigator Stevens:** And you know that [Bader], he knows that when he tries to arrest you, lawful arrest, you attack him and then go for his gun on his belt.
>
> **Willingham:** I didn't go for his gun.
>
> **Detective Neavill:** Go ahead and stay here, we have a search warrant that we're going to process on you, and just so you know, nobody is going to attack you. They're gonna have to touch you, take photographs, what they need to do.

[¶40.]     Even if the two statements made by the officers after Willingham's

request to end the interview were designed to "elicit an incriminating response," he

made no further admissions. *See Innis*, 446 U.S. at 300–02, 100 S. Ct. at 1689–90.

After the colloquy cited above, the officers engaged in a short conversation with

Willingham about the booking process and the charges that would be filed against

him. After the interview ended, Willingham engaged Sergeant Hislip in

conversation as he transported him to the jail, but Hislip did not question him

except to encourage him to answer booking questions.[4]

---

4.     On several occasions, the United States Supreme Court has carved out routine booking questions as an exception to *Miranda*. *See Pennsylvania v. Muniz*, 496 U.S. 582, 601, 110 S. Ct. 2638, 2650, 110 L. Ed. 2d 528 (1990). Questions such as the suspect's "name, address, height, weight, eye color, date of birth, and current age do not qualify as custodial interrogation . . . because the questions were not intended to elicit information for investigatory purposes." *Id.*

[¶41.] The second factor, which requires that "a significant period of time" pass before the next interview and that the defendant receive a "fresh set" of *Miranda* warnings, is also satisfied. Law enforcement did not interview Willingham again until 3:30 p.m. the next day, nearly eighteen hours after Willingham invoked his right to remain silent. This was a "significant period of time" sufficient to satisfy the criteria set forth in *Mosley*; indeed, in *Mosley* itself, an interval of two hours was significant. 423 U.S. at 104, 96 S. Ct. at 327; *see also Hatley*, 990 F.2d at 1074 (two hours was significant); *Brown v. Caspari*, 186 F.3d 1011, 1015 (8th Cir. 1999) (three-hour interval significant). Additionally, at the onset of the second interview, Willingham was given a "fresh set of *Miranda* warnings," which he again waived.

[¶42.] The State admits it cannot meet the third *Mosley* criterion, namely, whether the subsequent interview involved a crime that was not the subject of the first interview. Nevertheless, "a second interrogation is not rendered unconstitutional simply because it involves the same subject matter discussed during the first interview." *United States v. DeMarce*, 564 F.3d 989, 994 (8th Cir. 2009). This is especially so when there is no showing that the police conducted the subsequent interview "to induce [the defendant] to abandon his earlier assertion of his right to remain silent." *Brown*, 186 F.3d at 1015.

[¶43.] Here, law enforcement desired to interview Willingham again because the investigation was continuing and they had uncovered additional evidence—a gun and fifty pounds of marijuana. Prior to the interview, Sergeant Stevens approached him at the jail and asked if he would consent to another interview.

Willingham agreed and was then transported back to the CID for a second interview. He was Mirandized and again chose to waive his rights and speak to the officers. Although the interviews concerned the same crime, there is no evidence of repeated efforts by the officers to "wear down [Willingham's] resistance" or to convince him to waive his "earlier assertion of his right to remain silent" by interviewing him a second time. *Brown*, 186 F.3d at 1015. The officers scrupulously honored his right to stop questioning after the first interview. Based on our review of the circumstances surrounding the second interview we conclude Willingham's rights were not violated. The circuit court did not err by denying Willingham's motion to suppress his statements.

### 3. Whether the circuit court erred by rejecting Willingham's proposed lesser-included offense instructions.

[¶44.] Willingham was charged with commission of a felony with a firearm. He tendered instructions on concealment of a weapon with intent to commit a felony and carrying a concealed pistol or revolver without a permit as lesser-included offenses. A lesser-included offense instruction is appropriate if the elements test is satisfied and there exists "some evidence in support of such instructions[.]" *Giroux*, 2004 S.D. 24, ¶ 5, 676 N.W.2d at 141. To meet the elements test, three factors must be present:

> (1) [A]ll of the elements of the included offense are fewer in number than the elements of the greater offense; (2) the penalty for the included lesser offense must be less than that of the greater offense; and (3) both offenses must contain common elements so that the greater offense cannot be committed without also committing the lesser offense.

*Id.* It is unnecessary to assess whether some evidence exists in the record to support the instruction unless the elements test is met. *State v. Hoadley*, 2002 S.D. 109, ¶ 49, 651 N.W.2d 249, 260.

[¶45.] A person is guilty of commission of a felony with a firearm—the "greater offense" in this case—when he "commits or attempts to commit any felony while armed with a firearm, including a machine gun or short shotgun[.]" SDCL 22-14-12. In comparison, concealment of a weapon with the intent to commit a felony prohibits a person from "conceal[ing] on or about his or her person a controlled or dangerous weapon with intent to commit a felony[.]" SDCL 22-14-8. Upon review of the elements of each crime, while concealing a weapon is required to commit the lesser offense, it is not required for the greater offense. This is because it is possible to commit or attempt to commit a felony while armed with a firearm that was not concealed. Accordingly, concealment of a weapon with the intent to commit a felony is not a lesser-included offense of commission of a felony with a firearm.

[¶46.] For the same reason, carrying a concealed pistol or revolver without a permit is not a lesser-included offense of commission of a felony with a firearm. SDCL 22-14-9,[5] lists the elements of unlawfully carrying a concealed weapon, as follows:

> Any person, other than a law enforcement officer as defined in § 22-1-2 acting under color of authority, who:
>
>> (1) Carries a pistol or revolver, loaded or unloaded, concealed on or about his or her person without a permit as provided in chapter 23-7; or

---

5. The Legislature repealed SDCL 22-14-9 with Act of July 1, 2019, ch. 113, §§ 1, 2 (altering the permit requirements for carrying a concealed weapon).

-18-

> (2) Carries a pistol or revolver, loaded or unloaded, concealed in any vehicle while operating the vehicle, without a permit as provided in chapter 23-7;

is guilty of a class 1 misdemeanor.

To violate this provision, a defendant must carry a concealed weapon, whereas commission of a felony with a firearm does not require concealment. Again, a defendant could be convicted of committing the greater offense without also committing the lesser. Indeed, we have previously held that carrying a concealed pistol or revolver without a permit is not a lesser-included offense of commission of a felony with a firearm. *State v. McGarrett*, 535 N.W.2d 765, 769 (S.D. 1995). Because neither of Willingham's proposed lesser included offenses pass the elements test, reviewing the record for supporting evidence is unnecessary. The circuit court did not err in refusing to give Willingham's proposed lesser included offense instructions. We affirm.

[¶47.] GILBERTSON, Chief Justice, and JENSEN and SALTER, Justices, and SEVERSON, Retired Justice, concur.