[Crim. No. 37731. Second Dist., Div. Three. Jan. 26, 1981.]

THE PEOPLE, Plaintiff and Appellant, v.
DONALD JEROME HAUGLAND, Defendant and Respondent.

COUNSEL

John K. Van de Kamp, District Attorney, Harry B. Sondheim, Donald J. Kaplan and Roderick W. Leonard, Deputy District Attorneys, for Plaintiff and Appellant.

Samuel M. Weiss for Defendant and Respondent.

OPINION

KLEIN, P. J.—The People of the State of California appeal from the dismissal of an information charging one count of possession of metha-

qualone for purposes of sale (Health & Saf. Code, § 11378), a felony, one count of carrying a loaded firearm (Pen. Code, § 12031, subd. (a)), a misdemeanor, and one count of carrying a concealed weapon (Pen. Code, § 12025, subd. (b)), a misdemeanor, against Donald Jerome Haugland (Haugland) pursuant to the granting of Haugland's motion to suppress (Pen. Code, § 1538.5).

FACTS[1]

In the late afternoon of May 8, 1979, Belvia Arch (Arch), a taxi driver, was operating his taxi at Los Angeles International Airport where he picked up a customer later identified as Haugland. Haugland directed Arch to an address in the 4000 block of Via Marina in Marina Del Rey. En route, Haugland inferred to Arch that he was a hit man from Las Vegas, had come to Los Angeles to collect some money and asked Arch if he was interested in selling drugs, to which Arch replied in the negative. Haugland showed Arch a gun clip containing hollowed bullets.

Upon arriving at the Marina address, Haugland instructed Arch to wait for him. Ten minutes later Haugland returned to the taxi and directed Arch to take him to a hardware store where he could find a knife. Arch transported him to a store on Venice Boulevard. After looking around in the store, Haugland returned to the taxi and directed Arch to take him to the Hungry Tiger Restaurant.

When he reached the restaurant, Arch, who was by then "scared" and eager to get away, told Haugland he could not stay and wait for him and gave him a blank United Independent Taxi card so he could call another taxi. Haugland wrote Arch's name on the card. Haugland then obtained another business card from Arch, on the back of which he wrote the words "Nevada Iron Man, Son, Gold, Coke, Lude" and a phone number and returned the card to Arch. Haugland then went into the restaurant with his briefcase, and Arch drove off toward the airport looking for "the first police [he] could find."

Arch saw a police car parked at a restaurant, went in and found two police officers having lunch. Arch, who was by then extremely upset,

---

[1] The motion pursuant to Penal Code section 1538.5 was submitted on the transcript of the preliminary hearing. Penal Code section 1538.5 provides in pertinent part: "A defendant may move ... to suppress as evidence any tangible or intangible thing obtained as a result of a search or seizure on ... the following grounds: (1) the search or seizure without a warrant was unreasonable."

shaking and crying, told the officers everything that had just transpired and gave them the business card Haugland had returned to him.[2] Arch also related a physical description of Haugland, described the way he was dressed, and mentioned the briefcase.

One of the officers testified that Arch, who was "shaking, crying, and extremely upset," approached him and related the incident. Arch told the officer that en route in the cab Haugland had removed the clip from the automatic pistol and showed him the hollow-point bullets and that Haugland had asked Arch if he could supply him with a silencer for the weapon. Haugland had the gun in a briefcase. Arch recounted that Haugland told him that he had a lot of narcotics for sale and that he was in Los Angeles "to shoot a man who had not paid his dues in Las Vegas."

The officers then proceeded to the Hungry Tiger Restaurant and, approximately 10 minutes after arriving, saw Haugland leave the restaurant carrying a briefcase similar to that which Arch had described. The officers stopped Haugland, and while one patted him down for weapons, the other moved his briefcase to a point about six feet away. When the officer asked him what was inside, Haugland responded that he had "personal items" in the briefcase. The officer informed him that he had received information that Haugland had a loaded firearm in his briefcase and that he was in Los Angeles to shoot someone. Haugland replied that "there was in fact a gun in the briefcase, but he wasn't going to shoot anyone with it, he was just here to sell it."

Thereafter the officer opened the briefcase and found a stainless steel .45 caliber automatic, containing a clip with seven live hollow-point rounds in it. Also in the briefcase were a black holster, a brown leather gun bag, and a shaving kit bag. The officer noticed a slight bulge in the kit which felt hard to the touch. Believing that a weapon might be inside, the officer opened the kit and removed a clear plastic bag containing numerous tablets which appeared to be quaaludes. Haugland was placed under arrest.

## CONTENTIONS

The People contend that the trial court erroneously granted Haugland's section 1538.5 motion and dismissed the case since Haugland's

---

[2]At the preliminary hearing Arch testified that he "told the police officers everything what happened from the time I picked the man up until I dropped him off, and I gave them every bit of evidence, including the cards and the names ...."

detention was proper, his *Miranda* rights were not violated, and the "search" of his briefcase and shaving kit was proper.

## DISPOSITION

We find the People's contentions to be meritorious for the reasons set forth below and therefore reverse the order of dismissal.

## DISCUSSION

The detention of Haugland by the police officers in the present fact situation was not only proper but part of their official duties. There was no reason for the officers to distrust or doubt the cab driver's report of his horrendous experience.

"It is settled that circumstances short of probable cause to make an arrest may justify a police officer stopping and briefly detaining a person for questioning or other limited investigation. [Citations.] ... [T]he courts have concluded that in order to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity. Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to do so: the facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his training and experience [citation], to suspect the same criminal activity and the same involvement by the person in question. [Fn. omitted.]" (*In re Tony C.* (1978) 21 Cal.3d 888, 892-893 [148 Cal.Rptr. 366, 582 P.2d 957]; *People v. Burnett* (1980) 107 Cal.App.3d 795, 798-799 [165 Cal.Rptr. 781].)

The circumstances surrounding the detention herein patently are objectively reasonable. There is no evidence to suggest that the officers did not subjectively entertain a reasonable suspicion; on the contrary, they immediately acted on the information.

Reviewing the facts with the required standards in mind, we reiterate that a citizen informant cab driver told the police that he had just dropped off a male passenger, armed with a loaded handgun, who volunteered that he was in Los Angeles "to shoot a man who had not paid his dues in Las Vegas." The distraught and visibly shaken Arch related

to the officers such details as having been shown the gun clip containing hollow-point bullets and having been asked by Haugland if he could supply a silencer for the weapon. In addition, Haugland wanted the cab driver to sell narcotics for him.

The officers were provided with a description of Haugland and the briefcase, and the location where Arch left him. At this juncture, the officers would have been derelict had they not proceeded to check out Arch's information with a sense of urgency.

They went immediately to the location and observed a man fitting the description exit the restaurant. They encountered Haugland on the street and removed the briefcase from him for the protection of the officers and Haugland.

Since the officers possessed a reasonable suspicion of Haugland's involvement in criminal activity, they were justified, if not required, to temporarily stop Haugland for questioning and other limited investigation. They asked Haugland what he had in the briefcase, and when Haugland responded that it contained "personal items," they related that they had information he was carrying a loaded firearm and was going to shoot someone. Haugland answered that there was in fact a gun in the briefcase but that it was his intention to sell the gun.

With Haugland's statement that there was a loaded gun in the briefcase, the officers opened it and retrieved the gun. Visible inside the briefcase were a gun holster, a gun bag, and a shaving kit bag with a hard object in it, which the officers reasonably believed contained another weapon. The contents turned out to be narcotics. Haugland was arrested on the spot.

■ The whole purpose of a detention short of probable cause to make an arrest but based on reasonable suspicion of criminal activity is to "enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges." (*People* v. *Manis* (1969) 268 Cal.App.2d 653, 665 [74 Cal.Rptr. 423].) Here, based on Haugland's responses to the two questions put to him by the officer, it was obvious that Haugland could not be sent on his way. His response implicated him in the crimes of carrying a loaded firearm and carrying a concealed weapon.

■ Turning to the *Miranda* issue (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), where a person is temporarily detained for brief questioning by police officers who lack probable cause to make an arrest, that person need not be advised of *Miranda* rights and waive those rights prior to the officers engaging in any questioning. (*People* v. *Manis* (1969) 268 Cal.App.2d 653, 669 [74 Cal.Rptr. 423]; *People* v. *Carter* (1980) 108 Cal.App.3d 127, 130-131 [116 Cal.Rptr. 304].) "As consistently amplified in cases, the *Miranda* warning presupposes the existence of an accused where questioning without warning would be for accusatory, rather than investigatory, purposes. (*Escobedo* v. *Illinois* (1964) 378 U.S. 478, 492 [12 L.Ed.2d 977, 986-987, 84 S.Ct. 1758].) Temporary detention, however, cannot be equated with custody; it is an investigatory, rather than an accusatory, stage." (*People* v. *Patterson* (1979) 88 Cal.App.3d 742, 747 [152 Cal.Rptr. 183].)

There is a valid reason for the rule that *Miranda* warnings are not required when the questioning is incident to detention. "'When circumstances demand immediate investigation by the police, the most useful, the most available tool for such investigation is general on-the-scene questioning, designed to bring out the person's explanation or lack of explanation of the circumstances which aroused the suspicion of the police, and enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges.'" (*People* v. *Manis, supra*, 268 Cal.App.2d at p. 665; *People* v. *Carter, supra*, 108 Cal.App.3d at pp. 130-131.)

These principles were certainly applicable to the fact situation before us. The information the officers had was more than sufficient to detain and question Haugland, to investigate immediately and quickly to determine whether Haugland was engaged in illicit, possibly murderous, activity, and to resolve whether to allow Haugland to go about his business or to take him into custody. The briefness of the stop and the limited questioning which was designed to elicit either exculpatory information or confirmation of what the officers had been told were not in violation of *Miranda* v. *Arizona, supra*.

■ The final issue raised by the People in this appeal from the granting of Haugland's motion to dismiss pursuant to Penal Code section 1538.5 deals with the alleged warrantless search of Haugland's briefcase. However, it strikes us that this case may not involve a search in the constitutional sense. In analyzing the definition of a

search, it would seem no "search" occurred under the present set of circumstances.

"A 'search,' as that term is used in the Fourth Amendment to the federal Constitution and in our own Constitution, implies some exploratory investigation or an invasion and a quest, a looking for or seeking out [citation]." (*People* v. *Ammons* (1980) 103 Cal.App.3d 20, 26 [162 Cal.Rptr. 772].)

"[A] search within the meaning of the Fourth Amendment occurs whenever one's reasonable expectation of privacy is violated by unreasonable governmental intrusion. [Citations.]" (*People* v. *Smith* (1977) 67 Cal.App.3d 638, 651 [136 Cal.Rptr. 764].)

Here, when the officers opened Haugland's briefcase, they were not "searching" for anything; they *knew* it contained a loaded gun and went about *retrieving* the weapon. There was no seeking out of a hidden object, and Haugland gave up any reasonable expectation of privacy when he told the officers the briefcase contained a loaded gun.

It would seem an unreasonable requirement under the circumstances here, and a waste of precious police and judicial time and effort, to require the officers to locate a magistrate and obtain a search warrant prior to removing the known dangerous object.

Our analogy might be compared to the plain view doctrine wherein the observation of things in plain sight does not amount to a search. (*Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 634 [108 Cal.Rptr. 585, 511 P.2d 33].) It is difficult to discern a logical difference between taking notice of some object in plain view and in being made aware of the existence of an object by someone describing said object under believable and trustworthy conditions. Had the gun been in plain view, the officers could have confiscated it; instead Haugland, in admitting to a crime, *told* them there was a gun in the briefcase.

■ In any event, this case would be subject to the "exigent circumstances" exception set forth in *People* v. *Minjares* (1979) 24 Cal.3d 410 [153 Cal.Rptr. 224, 591 P.2d 514] and *People* v. *Flores* (1980) 100 Cal.App.3d 221, 233 [160 Cal.Rptr. 839]. "There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." (*People* v. *Ramey* (1976) 16 Cal.3d 263, 276

[127 Cal.Rptr. 629, 545 P.2d 1333]; *People v. Stamper* (1980) 106 Cal.App.3d 301, 306 [164 Cal.Rptr. 861].)

The "exigent circumstance" in this case is the presence of a loaded automatic pistol in the briefcase, which for the protection of Haugland, the officers, and any other persons within the immediate vicinity should have been removed and rendered safe before transportation.

No matter how the fact situation before us is characterized—whether as not amounting to a search in the constitutional sense, or as a theory analogous to the plain view doctrine, or as creating an "exigent circumstance," or as an effective consent to "search" the briefcase, we are convinced there was no violation of Haugland's Fourth Amendment rights.

■ The People finally argue that the subsequent search of the shaving kit bag was permissible. Again, we agree. The police officers had already found one loaded weapon, an empty holster, and an empty leather gun bag. Arch had informed the officers that defendant had expressed a desire to obtain a silencer and another weapon, possibly a knife. The police officer noticed a bulge in the shaving kit that felt hard and reasonably believed that another weapon might be present. On these particular facts, we find that both probable cause and exigency were present and that the police officer committed no constitutional violation by examining the contents of the shaving kit. The continuing threat and the probable cause furnished by discovery of the first weapon authorized the search. (See *People v. Block* (1971) 6 Cal.3d 239, 243 [103 Cal.Rptr. 281, 499 P.2d 961]; *People v. Dooley* (1976) 64 Cal.App.3d 502, 512-513 [134 Cal.Rptr. 573].)

Accordingly, the judgment is reversed.

Allport, J., and Potter, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied March 25, 1981. Bird, C. J., was of the opinion that the petition should be granted.