#27325-a-GAS
**2016 S.D. 34**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

BRAIDEN MCCAHREN,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JOHN L. BROWN
Judge

* * * *

MARTY J. JACKLEY
Attorney General

PATRICIA ARCHER
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
    and appellee.


MICHAEL J. BUTLER
Sioux Falls, South Dakota

and

CLINT L. SARGENT
RALEIGH HANSMAN of
Meierhenry & Sargent, LLP
Sioux Falls, South Dakota                    Attorneys for defendant
    and appellant.

* * * *

ARGUED ON
JANUARY 13, 2016
OPINION FILED **04/20/16**

#27325

SEVERSON, Justice

[¶1.]     A jury found Braiden McCahren guilty of second-degree murder after he fatally shot Dalton Williams.  The jury also found him guilty of aggravated assault of Tyus Youngberg.  On appeal, McCahren asserts that a jury instruction on second-degree murder violated his constitutional rights.  He further asserts that the circuit court improperly limited his cross-examination of a State witness and improperly refused to suppress McCahren's statements made to a roommate at a juvenile facility and his statements made to an officer immediately after the shooting.  Finally, McCahren asserts that his sentence for aggravated assault is cruel and unusual thereby violating the Eighth Amendment.  We affirm.

## Background

[¶2.]     On September 23, 2014, a jury found McCahren guilty of second-degree murder of Dalton Williams and aggravated assault of Tyus Youngberg.  The jury heard testimony from Tyus Youngberg.  He testified that the death was a result of an incident on December 18, 2012.  Youngberg testified that McCahren, Youngberg, and Williams were at McCahren's house when McCahren went to a gun rack and grabbed a shotgun, shouldering it as if to shoot something.  Youngberg initially told the police that they were messing around and that the shooting was accidental.  He later testified at trial that it was intentional.  He further testified that McCahren pulled the trigger of the gun as he was pointing it at Youngberg, but the gun just clicked.  According to Youngberg, McCahren then opened a drawer and pulled out a 20-gauge shell.  At this point, Youngberg tried to leave the house through a sliding glass door.  In order to get to the door, he went past Williams, who was now

-1-

between Youngberg and McCahren. Youngberg heard another click but no discharge occurred. Youngberg testified that he was unable to open the glass door, so he intended to run to the garage but Williams was in his path. As he was attempting to move Williams out of the way, the gun held by McCahren discharged. The shot hit Williams, who subsequently died. McCahren contends the shooting was an accident.

[¶3.] Youngberg called 911 to report the shooting. Upon arrival, law enforcement questioned Youngberg and McCahren about the incident. Officer Martin Waller interviewed McCahren in a patrol car, while another officer interviewed Youngberg. In the patrol car, Waller asked McCahren to tell him what happened. McCahren told Waller that he was messing around with a gun that he thought was empty but the gun discharged and a shot hit Williams. After obtaining some of the details of the incident, Waller asked McCahren if he had contacted his father yet. Upon McCahren's negative response, Waller contacted McCahren's father. Waller informed the father, Kit McCahren, about the incident and then allowed McCahren to speak with his father. Later, upon learning that the incident may not have been an accident, Waller placed McCahren under arrest.

[¶4.] As a result of the incident, McCahren was indicted for first-degree murder, attempted first-degree murder, and aggravated assault. At the conclusion of a jury trial on those three charges, the State requested that the jury also receive an instruction for second-degree murder. The State made the request during the settling of jury instructions, after all evidence from the prosecution and defense had been presented to the jury, and 90 minutes before closing arguments. Over defense

objection, the court granted the State's request and instructed the jury on second-degree murder. The jury found McCahren guilty of second-degree murder of Williams and aggravated assault of Youngberg. The court sentenced McCahren to twenty-five years with fifteen years suspended for second-degree murder and fifteen years for aggravated assault, to run concurrently with the second-degree murder sentence. McCahren now appeals the court's decision to instruct the jury on the offense of second-degree murder. McCahren further appeals the court's decision to limit the defense's cross-examination of one of the State's witnesses, the court's refusal to suppress McCahren's statements made to a roommate at Western Area Juvenile Services Center, and the court's refusal to suppress McCahren's statements made to Officer Waller in the patrol car. Lastly, McCahren asserts that the imposition of the maximum sentence for the aggravated-assault conviction is cruel and unusual.

## Analysis

*Second-degree murder instructions*

[¶5.] "In general, we 'review a trial court's decision to grant or deny a particular instruction under the abuse of discretion standard.'" *State v. Waloke*, 2013 S.D. 55, ¶ 28, 835 N.W.2d 105, 112-13 (quoting *State v. Roach*, 2012 S.D. 91, ¶ 13, 825 N.W.2d 258, 263). Questions of law are reviewed de novo. *See id*. at 113.

[¶6.] McCahren asserts that the court's decision to instruct the jury on second-degree murder deprived him of his constitutional right to notice of the charges against him and his right to defend against such because second-degree murder was not charged in the indictment. He relies on *State v. Lohnes*, 324

N.W.2d 409, 412 (S.D. 1982), in which the lower court, over the defendant's objection, instructed on second-degree murder despite that offense not being charged. In *Lohnes*, we determined that such an approach violated the defendant's constitutional right to be informed of the nature and cause of the accusation against him. *Id.* Since *Lohnes* was decided, the jurisprudence surrounding homicide charges and lesser-included offenses in homicide trials has changed. Therefore, the question in front of us today is the applicability of *Lohnes* in light of our evolved statutes and precedent on lesser-included offenses, specifically with regard to the differing degrees of homicide.

[¶7.]        Article VI, § 7 of our constitution provides an accused with the right to:

> defend in person and by counsel; to demand the nature and cause of the accusation against him; to have a copy thereof; to meet the witnesses against him face to face; to have compulsory process served for obtaining witnesses in his behalf, and to a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed.

S.D. Const. art. VI, § 7. The indictment's "principal office . . . is to inform the accused of the nature and cause of the accusation against him; to be thus informed being one of the accused's most important constitutional rights." *Lohnes*, 324 N.W.2d at 412 (quoting *State ex. rel. Kotilinic v. Swenson*, 18 S.D. 196, 202, 99 N.W. 1114, 1115 (1904)). Courts have explained that "[a] lesser included offense need not be charged in an indictment, as it is already included in the offense charged." *United States v. McGeehan*, 824 F.2d 677, 679 n.2 (8th Cir. 1987) (citing *United States v. Martel*, 792 F.2d 630, 638 (7th Cir. 1986)); *accord* Fed. R. Crim. P. 31(c) ("A defendant may be found guilty of any of the following: (1) an offense necessarily included in the offense charged; (2) an attempt to commit the offense charged; or (3)

an attempt to commit an offense necessarily included in the offense charged, if the attempt is an offense in its own right."); SDCL 23A-26-8 (Rule 31 (c)) ("A defendant may be found guilty of an offense necessarily included in the offense charged[.]").

[¶8.]        We have applied the elements test to determine which offenses are lesser-included. *See Waloke*, 2013 S.D. 55, ¶ 29, 835 N.W.2d at 113 (outlining the history of this Court's treatment of lesser-included offense instructions). The elements test is satisfied where:

> (1) all of the elements of the included offense are fewer in number than the elements of the greater offense;[1] (2) the penalty for the included lesser offense must be less than that of the greater offense; and (3) both offenses must contain common elements so that the greater offense cannot be committed without also committing the lesser offense.

*State v. Giroux*, 2004 S.D. 24, ¶ 5, 676 N.W.2d 139, 141 (quoting *State v. Hoadley*, 2002 S.D. 109, ¶ 61, 651 N.W.2d 249, 263). Once the elements test is met, an instruction on the lesser-included offense may only be given if some evidence was presented that supports the instruction. *Hoadley*, 2002 S.D. 109, ¶ 64, 651 N.W.2d at 264. Our elements test "provides certainty and predictability in determining lesser-included offenses and is compatible with the constitutional principles of double jeopardy, due process, and notice while maintaining mutuality." *Id.* ¶ 66, 651 N.W.2d at 265 (quoting Tim Dallas Tucker, *State v. Black: Confusion in South Dakota's Determination of Lesser Included Offenses in Homicide Cases*, 41 S.D. L. Rev. 465, 501 (1996)) (adopting elements test). "In 2005, the Legislature validated

---

1.    If two homicide offenses contain common elements but require differing levels of intent, this part of the test is also met where the mens rea requirement of a lesser crime is a lesser element contained within the greater offenses's mens rea requirement. *See infra* ¶¶ 10-11.

this approach . . . in homicide cases by codifying the possible lesser included offenses for various degrees of murder and manslaughter." *Waloke*, 2013 S.D. 55, ¶ 29, 835 N.W.2d at 113 (citing SDCL 22-16-20.1). The Legislature provided that "[m]urder in the second degree is a lesser included offense of murder in the first degree." SDCL 22-16-20.1.[2] It also codified the factual requirement in SDCL 22-16-20.2.[3]

[¶9.]      Our adoption of the elements test and the Legislature's codification of the lesser-included murder and manslaughter offenses occurred well after our *Lohnes* decision, where we were concerned that second-degree murder was an offense never charged that had "distinctly different elements than first-degree murder." *Lohnes*, 324 N.W.2d at 412. We rejected the State's argument in *Lohnes* that a lesser-included instruction was appropriate due to SDCL 23A-26-7,[4] which

---

2.      SDCL 22-16-20.1 provides in full:

> Murder in the second degree is a lesser included offense of murder in the first degree. Manslaughter in the first degree is a lesser included offense of murder in the first degree and murder in the second degree. Manslaughter in the second degree is a lesser included offense of murder in the first degree, murder in the second degree, and manslaughter in the first degree.

3.      SDCL 22-16-20.2 states:

> A lesser included offense instruction shall be given at any homicide trial whenever any facts are submitted to the trier of fact which would support such an offense pursuant to this chapter. The state and the defendant each have the separate right to request a lesser included offense instruction. The failure to request a lesser included offense instruction constitutes a waiver of the right to such an instruction.

4.      SDCL 23A-26-7 stated in 1982, as it does today:

(continued . . .)

mandates that the jury find the degree of the crime that it convicts the defendant of having committed. *Id.* We explained that the statute "ha[s] no effect on the elements of the first and second-degree murder charge." *Id.* McCahren points out that the elements of first and second-degree murder remain different today because first-degree murder requires premeditation. SDCL 22-16-4(1). In contrast, second-degree murder requires a depraved mind. SDCL 22-16-7.

[¶10.] McCahren contends that as a result of those "different" elements, second-degree murder is not a true lesser-included offense. Nonetheless, as Judge Tucker explained, even under the elements test, second-degree murder is a lesser included offense of first-degree murder because we consider the mens rea requirement of depraved mind as a less culpable mens rea contained within the greater offense's requirement of premeditation—"evincing a depraved mind, regardless of human life, although without any premeditated design to effect death is a lesser mental state than premeditation." Tucker, *State v. Black*, 41 S.D. L. Rev. at 496 (quotation marks omitted) (footnote omitted). We adopted this approach to the mens rea requirements in *Hoadley*, 2002 S.D. 109, ¶ 61 n.12, 651 N.W.2d at 263 n.12. And when considering whether a second-degree murder or manslaughter instruction should be given on the charged offense of first-degree murder, we have previously determined that "the elements test was met[.]" *Id.* ¶ 64, 651 N.W.2d at

---

(. . . continued)

> Whenever a crime is distinguished by degrees, a jury, if it convicts an accused, shall find the degree of the crime of which he is guilty and include that finding in its verdict. When there is a reasonable ground of doubt as to which of two or more degrees an accused is guilty, he can be convicted of only the lowest degree.

264. We also explained, two years later, in *Giroux*, "[t]he use of different words does not necessarily eliminate a crime as a lesser-included-offense. Our analysis . . . uses the degree of culpability analysis . . . ." 2004 S.D. 24, ¶ 8, 676 N.W.2d at 142. As soon as we adopted such an approach, the holding in *Lohnes* was overruled to the extent that it determined that second-degree murder could not be a lesser-included offense of first-degree murder due to the differing mens rea elements of the two crimes. *See Lohnes*, 324 N.W.2d at 412.

[¶11.] It is true, as McCahren states, that a statute cannot override constitutional protections. However, our elements test and statute operate to provide a defendant with the notice he or she is entitled. Under SDCL 22-16-20.2, a lesser-included instruction can only be given to the jury if there are "any facts . . . which would support such an offense[.]" Although a court may need to wait until the close of evidence to determine whether a lesser-included instruction is warranted, such an approach does not deprive a defendant of constitutionally required notice. Our elements test established a number of years ago that second-degree murder is a lesser-included offense of first-degree murder, and SDCL 22-16-20.1 removed any doubt regarding such. Due process is fulfilled under our approach to lesser-included homicide offenses because each lesser offense has lesser elements, either in number or degree of culpability, than the greater offense. The greater offense cannot be committed without also committing the lesser offense. Thus, a defendant will be able to anticipate and defend against lesser-included offenses during preparation and trial on the greater offense because the lesser-included is "already included in the offense charged." *See McGeehan*, 824 F.2d at 679 n.2.

Further, SDCL 22-16-20.2 ensures that an instruction will not be given if no facts support the instruction. Such an approach satisfies due process concerns. *See Hoadley*, 2002 S.D. 109, ¶ 66, 651 N.W.2d at 265.

[¶12.] Along with SDCL 20-16-20.1, -20.2, our law provides that "[a] defendant may be found guilty of an offense necessarily included in the offense *charged*[.]" SDCL 23A-26-8 (Rule 31(c)) (emphasis added). The statute clearly contemplates uncharged offenses. Our approach is not unique. The Supreme Court, when analyzing the federal rule of criminal procedure 31(c), which mirrors ours, adopted the elements test, in part, because it allows "both sides to know in advance what jury instructions will be available and to plan their trial strategies accordingly." *Schmuck v. United States*, 489 U.S. 705, 720, 109 S. Ct. 1443, 1453, 103 L. Ed. 2d 734 (1989).

[¶13.] In addition to the United States Supreme Court, other courts have addressed the question of when a lesser-included offense instruction is appropriate. *See State v. Rodriguez*, 429 A.2d 919, 929 (Conn. 1980) (collecting cases and noting that "courts consistently hold that where the evidence supports an instruction on a lesser degree of homicide than that charged, it is error to refuse to give such an instruction"). The Connecticut Supreme Court in *Rodriguez* faced the same issue that we now address. *Id.* Rodriguez was charged with murder, which required the specific intent to cause the death of another, and the trial court also instructed on manslaughter in the first and second-degree along with criminally negligent homicide, all of which required a state of mind different than intent to cause death.

*Id.* at 927. Thus, he alleged that, by giving additional instructions, the trial court violated his right to be informed of the crime he allegedly committed. *Id.*

[¶14.] The Connecticut Supreme Court held:

> Where the state is faced with a homicide prosecution, it may, in good faith and where the circumstances reasonably warrant, assume that an accused acted with the most culpable state of mind. But where the evidence is reasonably susceptible of another conclusion, the jury, or three judge panel, as the case may be . . . should not be bound by that assumption and forced by its verdict to choose only between the offense with the most culpable state of mind and acquittal. Such a result would limit the jury's function of determining questions of fact and undermine a defendant's right to a trial by jury. . . . Permitting the jury to find the defendant guilty of a lesser charge of homicide than that charged, where the evidence supports such a finding, does not violate the defendant's sixth amendment right to notice. By the charge on the greater offense of murder, the defendant is put on notice that he will be put on trial for his action in causing the death of another person. Thus, having been given notice of the most serious degree of culpable intent by the murder indictment, he is implicitly given notice of those lesser included homicides that require a less serious degree of culpable intent.

*Id.* at 929 (citations omitted). The Connecticut Supreme Court also explained that its approach was consistent with the Model Penal Code (MPC). *Id.* at 930. *See* Model Penal Code § 1.07 (4)(c) (emphasis added) ("A defendant may be convicted of an offense included in an offense charged in the indictment (or the information). An offense is so included when: (c) it differs from the offense charged only in the respect that a less serious injury or risk or injury to the same person, property or public interest *or a lesser kind of culpability suffices to establish its commission*."); *see also State v. Rush*, 50 S.W.3d 424, 431-32 (Tenn. 2001) (applying a modified version of the MPC and holding that "the trial court has a duty to instruct the jury regarding all applicable lesser-included offenses regardless of whether the defendant requests

-10-

the instruction." Thus, the trial court erred because it did not instruct the jury of the lesser-included crime of reckless endangerment even though the facts supported the charge and reckless endangerment requires a lesser risk of harm and "lesser degree of culpability than the knowing intent to kill contemplated by the offense of second degree murder[.]"). Accordingly, McCahren had sufficient notice that second-degree murder instructions may be given by the court.

[¶15.] McCahren reasons that we should prospectively apply our decision. McCahren maintains that he should not be punished for reversal of precedent that is more than 30 years old. However, as we noted above, though *Lohnes* validly holds that a defendant has the right to notice of the charges he faces, the holding in *Lohnes* on lesser-included instructions for first-degree and second-degree murder became questionable at least in 2002 when we adopted the elements test with Judge Tucker's recommended approach to the mens rea elements. *Supra* ¶ 10. And in 2005, the Legislature explicitly provided that second-degree murder is a lesser-included offense of first-degree murder. It is important to note that the statute provides that when the facts support the instruction in a homicide trial, the court shall give a lesser-included instruction, which may be requested by either the State or defendant. SDCL 22-16-20.2. Thus, under the law as it has existed for over a decade, McCahren cannot claim surprise that second-degree murder would be considered a lesser-included offense for which the jury could be instructed.[5]

---

5. On August 28, 2014, the State moved to exclude a lessor-included instruction on second-degree *manslaughter*. In its motion, the State asserted that no facts supported such an instruction. The court and counsel addressed the motion at a pretrial hearing on September 4, 2014. Although the motion

(continued . . .)

[¶16.]      Because second-degree murder instructions were warranted in this case if some facts supported it, we next consider McCahren's argument that the facts were insufficient to warrant the circuit court giving the instruction to the jury. Like the *Hoadley* court, we emphasize, "the question is *not* . . . whether there was *sufficient* evidence[,]" but whether there is some evidence. 2002 S.D. 109, ¶ 64 & n.14, 651 N.W.2d at 264 & n.14. We review the court's decision for an abuse of discretion. *Waloke*, 2013 S.D. 55, ¶ 28, 835 N.W.2d at 112-13. In this case, Youngberg testified that after the gun, which McCahren shouldered and pointed at Youngberg, failed to discharge, McCahren took a shell from a drawer and loaded the shotgun. Once again, McCahren pulled the trigger with the shotgun shouldered and pointed in the direction of Youngberg and Williams. This type of conduct supports the court's decision that the evidence supported instructing the jury on second-degree murder. We do not find an abuse of discretion. The law and facts supported a lesser-included offense instruction for second-degree murder.

[¶17.]      Lastly, McCahren asserts that the decision to instruct on second-degree murder deprived him of his right to testify on his own behalf, propose

---

(. . . continued)

   addressed second-degree manslaughter rather than second-degree murder, the defense was aware of SDCL 22-16-20.1 at the pretrial hearing. Defense counsel argued that it was premature to address lesser-included offenses because the "sole test on homicide lesser includeds [is whether] there's some evidence that would support [the] giving of it." The State agreed that such a motion was premature but stated that "it was something that [the State] wanted to bring to everybody's attention rather than doing it in the middle of the trial when instructions are settled so it gives time for people to research the issue." The court ruled that "it's well to have raised the issue and put everyone on notice as to the potential for that. But whether such an instruction will be requested or whether any evidence at trial would tend to support such an instruction will await for settling instructions at trial."

alternative jury instructions, and call an expert witness on his psychological status. McCahren asserts that he was precluded from offering instructions that explain the difference between the differing counts of homicide. However, he has not argued that the circuit court's instructions misstated the law. "We consider jury instructions 'as a whole, and if the instructions when so read correctly state the law and inform the jury, they are sufficient. This is a question of law reviewed de novo.'" *State v. Birdshead*, 2015 S.D. 77, ¶ 14, 871 N.W.2d 62, 70 (quoting *Waloke*, 2013 S.D. 55, ¶ 28, 835 N.W.2d at 113). From our review of the record, the court's instructions were sufficient. Additionally, because we have determined that McCahren had notice that second-degree-murder instructions could be given in this case, we do not find merit in McCahren's argument that he was prevented from taking the stand or presenting additional expert testimony.

*Testimony and cross-examination of T.D.*

[¶18.] Next, we address two issues that McCahren raises regarding the testimony of one of the State's witnesses. The State's witness, T.D., was McCahren's roommate while McCahren was at a juvenile facility in Pennington County. McCahren told T.D. details of the shooting, and McCahren now appeals admission of those statements at trial. He alleges that the statements are subject to the exclusionary rule because they are the result of illegal government activity.

[¶19.] In March 2013, pursuant to a court order, McCahren was transferred to the Pennington County Juvenile Services Center. The court ordered a psychological evaluation by Dr. Scovel. After the evaluation, McCahren was to return to the Hughes County Juvenile Services Center. McCahren arrived at the

Pennington facility on March 14, 2013, and he left on March 25, 2013. T.D. roomed with McCahren for part of the time that McCahren was at the facility.

[¶20.] In September 2013, the circuit court denied McCahren's motion to transfer proceedings to juvenile court. Part of its decision was based on Dr. Scovel's testimony and the report of her evaluation of McCahren. McCahren sought and was granted intermediate appeal, where he alleged that Dr. Scovel's examination of him exceeded the scope of an agreement between the State's Attorney and defense attorneys. The State's Attorney and defense had agreed that Dr. Scovel would not inquire into the December incident. We issued an order reversing the September order and remanding for the court to reconsider the motion without Dr. Scovel's report or testimony. We held, "It appears that Defendant's Fifth and Sixth Amendment rights were violated by breach of the agreement between the State and defense counsel on the scope of Dr. Scovel's examination of Defendant."

[¶21.] McCahren contends that T.D.'s testimony regarding conversations that McCahren had with T.D. should be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). "The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search." *State v. Heney*, 2013 S.D. 77, ¶ 9, 839 N.W.2d 558, 562 (quoting *State v. Boll*, 2002 S.D. 114, ¶ 19, 651 N.W.2d 710, 716). "The exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Id.* (quoting *Segura v. United States,* 468

U.S. 796, 804, 104 S. Ct. 3380, 3385, 82 L. Ed. 2d 599 (1984)). However, "[s]uppression is not justified unless the challenged evidence is in some sense the product of illegal governmental activity." *Id.* ¶ 11 (quoting *Segura*, 468 U.S. at 815, 104 S. Ct. at 3391). The party seeking to suppress the evidence has the burden "to establish that such evidence was illegally seized." *Id.* (quoting *State v. Rigsbee*, 89 S.D. 360, 376, 233 N.W.2d 312, 321 (1975)). This rule has been applied to Fifth and Sixth Amendment violations, as occurred in this case. *See Nix v. Williams*, 467 U.S. 431, 442, 104 S. Ct. 2501, 2508, 81 L. Ed. 3d 377 (1984).

[¶22.] We previously determined in the intermediate appeal of the transfer hearing decision that the scope of the examination exceeded McCahren's constitutional rights. Therefore, in order to meet his burden, McCahren needs to initially demonstrate that there is a "factual nexus between the constitutional violation and the challenged evidence" and that the illegality "is at least the 'but for' cause of the discovery of the evidence." *Heney,* 2013 S.D. 77, ¶¶ 11-12, 839 N.W.2d at 562. However, "'but-for causality is only a necessary, not a sufficient, condition for suppression' under the fruit of the poisonous tree doctrine." *Id.* (quoting *Hudson v. Michigan*, 547 U.S. 586, 592, 126 S. Ct. 2159, 2164, 165 L. Ed. 2d 56 (2006)). "The primary focus of our analysis is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Heney*, 2013 S.D. 77, ¶ 12, 839 N.W.2d at 562-63 (quoting *Boll*, 2002 S.D. 114, ¶ 32, 651 N.W.2d at 719).

[¶23.]     In its findings of fact on McCahren's motion to suppress T.D.'s statements, the circuit court found: T.D. and McCahren were placed together based on the availability of cells, and the roommate assignment was random; law enforcement had no involvement in placing T.D. in the same cell as McCahren; law enforcement had no contact with T.D. regarding this case prior to T.D.'s placement in the same cell with McCahren; there was no contact between law enforcement and T.D. until one month after T.D. had roomed with McCahren, and that contact occurred when T.D. initiated the disclosure of his conversations with McCahren; law enforcement did not direct or control T.D.; and T.D. did not ask for any benefit or reward for talking to law enforcement.

[¶24.]     McCahren fails to address how his statements to T.D. satisfy the causal nexus requirement. Although he validly asserts that unconstitutional conduct should be deterred, the results of the constitutional violation (exceeding the scope of the exam), have already been suppressed. The order transferring McCahren to Pennington County was valid; as was the purpose of the psychological evaluation. It was only the scope of the evaluation that we deemed unconstitutional. Therefore, McCahren was properly placed in the juvenile center and randomly assigned a roommate. There is no indication that 'but for' the illegal scope of Dr. Scovel's examination McCahren would not have discussed the details of his crime with his roommate.

[¶25.]     Failing suppression, McCahren asserts that he was denied his constitutional right to cross-examine T.D. because the circuit court refused to allow cross-examination on T.D.'s mental health. The Sixth Amendment to the United

States Constitution and Article VI, § 7 of the South Dakota Constitution guarantees an accused the right to confront witnesses. However, "[t]he Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *State v. McKinney*, 2005 S.D. 73, ¶ 21, 699 N.W.2d 471, 479 (quoting *Kentucky v. Stincer*, 482 U.S. 730, 739, 107 S. Ct. 2658, 2664, 96 L. Ed. 2d 631, 643 (1987)). "[T]he [circuit] court retains broad discretion concerning the limitation of cross-examination[,] and it will be reversed only when there is a clear showing of abuse of discretion and a showing of prejudice to the defendant." *State v. Walton*, 1999 S.D. 80, ¶ 25, 600 N.W.2d 524, 530 (quoting *State v. Steichen*, 1998 S.D. 126, ¶ 37, 588 N.W.2d 870, 878).

[¶26.]     McCahren contends that "inherent in T.D.'s predispositions and symptoms recognized in his mental illness diagnosis" is his "inability to properly perceive and process events, relay his observations accurately in court, and his motivation to exaggerate, fabricate or lie without concern for the truth or the consequences of his actions for himself or others[.]" McCahren fails to point us to which diagnosis is relevant other than stating that T.D. had "active psychoses at the time he was incarcerated with [McCahren]" and that it was "a central fact prime for discussion and inquiry on cross-examination."

[¶27.]     McCahren points us to federal decisions that have held, "evidence on mental capacity may be especially probative of the ability to 'comprehend, know and correctly relate the truth[.]'" *United States v. Lindstrom*, 698 F.2d 1154, 1165-66 (11th Cir. 1983) (quoting *United States v. Partin*, 493 F.2d 750, 763-64 (5th Cir.

1974)); *United States v. Love*, 329 F.3d 981, 985 (8th Cir. 2003). However, McCahren's authority is distinguishable. The cases cited involved witnesses with significant and relevant diagnoses that are not at issue here. In *Lindstrom*, a key witness was diagnosed with schizophrenia, was delusional, and had a history of hallucinations. 698 F.2d at 1161-62. The court explained that "[c]ertain forms of mental disorder have high probative value on the issue of credibility." *Id.* at 1160. "A psychotic's veracity may be impaired by lack of capacity to observe, correlate or recollect actual events. . . . A schizophrenic may have difficulty distinguishing fact from fantasy and may have his memory distorted by delusions, hallucinations and paranoid thinking." *Id.* In *Love*, the court explained, "the nature of the psychological problem in question [was] memory loss—a condition that implicates [the witness's] ability 'to comprehend, know and correctly relate the truth.'" 329 F.3d at 985 (quoting *United States v. Jimenez*, 256 F.3d 330, 343 (5th Cir. 2001)). Nothing established that these types of problems existed with T.D. *See also, Love*, 329 F.3d at 984 (quoting *United States v. Jimenez*, 256 F.3d 330, 343 (5th Cir. 2001)) ("[T]o be relevant, the mental health records must evince an impairment of the witness's ability to comprehend, know, and correctly relate the truth.").

[¶28.] In this case, the circuit court allowed the defense to attack T.D's credibility through inconsistent, prior testimony and witness testimony. T.D's own father testified that T.D. "lies quite a bit, at least 80 to 90% of the time." After being questioned by defense counsel, T.D. admitted to various crimes of dishonesty, which included stealing people's identities, using credit cards belonging to other people, and stealing property. T.D. admitted that he had a lying problem in the

past but testified that he no longer suffered such a problem. He also admitted that he tends to brag and seek attention. The defense impeached T.D. on prior inconsistent statements, and T.D. testified that he lied to Detective Kavanagh about assaulting McCahren immediately upon meeting McCahren at the juvenile facility. T.D. freely admitted that, at the time he reported the conversations he had with McCahren to Agent Kavanagh, he was "still laboring under [the] lying problem." As a result, McCahren "has not established that [the] limitation prejudiced him or that, if the jury [had] been presented with this evidence, it would have had a significantly different impression." *See Walton*, 1999 S.D. 80, ¶ 27, 600 N.W.2d at 530-31. The jury heard testimony, including from T.D. himself, that T.D. had a problem telling the truth. It had the opportunity to judge T.D.'s credibility, and the circuit court did not abuse its discretion by denying McCahren inquiry into T.D.'s mental health diagnoses. Thus, McCahren was not denied his right to confront witnesses.

*Suppression of statements made to Officer Waller*

[¶29.] Next, we address McCahren's contention that statements he made to Officer Waller should have been suppressed. Officer Waller was with Deputy Kyle Cummings en route to a program sponsored by the police department when they responded to the 911 call of a discharged shotgun injuring an individual. He testified that it took about two minutes to get to the reported address. Waller was among the first officers at the scene; Sergeant Walz and Officer Martin arrived separately before Waller and Cummings. He observed officers running across the lawn and two juveniles, later identified as Youngberg and McCahren, standing in

the driveway. Waller was directed by Sergeant Walz to speak with the two juveniles. Waller asked the juveniles who the shooter was, and McCahren raised his hand in response. Waller asked McCahren to have a seat in Martin's car. Youngberg sat in Cummings' patrol vehicle with Cummings. Waller proceeded to ask McCahren what had happened. McCahren contends that he was in custody once Waller proceeded to ask questions after McCahren identified himself as the shooter. Therefore, McCahren maintains that Waller did not comply with the parental notification statute SDCL 26-7A-15[6] and his statements made in response to Waller's questions should be suppressed as they are in violation of his Fifth Amendment rights.[7]

[¶30.]     Individuals subject to a custodial interrogation are entitled to *Miranda* warnings. *See State v. Wright*, 2009 S.D. 51, ¶ 19, 768 N.W.2d 512, 520; *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). We utilize a two-part test when making a custody determination:

> First, what were the circumstances surrounding the
> interrogation; and second, given those circumstances, would a

6.     SDCL 26-7A-15 provides in part:

> The officer or party who takes a child into temporary custody,
> with or without a court order, except under a court order issued
> during a noticed hearing after an action has been commenced,
> shall immediately, without unnecessary delay in keeping with
> the circumstances, inform the child's parents, guardian, or
> custodian of the temporary custody and of the right to a prompt
> hearing by the court to determine whether temporary custody
> should be continued.

7.     "This Court reviews the denial of a motion to suppress alleging a violation of
a constitutionally protected right as a question of law by applying the de novo
standard." *State v. Bowker*, 2008 S.D. 61, ¶ 17, 754 N.W.2d 56, 62. "However
we apply the clearly erroneous standard to the factual findings below." *Id.*

> reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

*Wright,* 2009 S.D. 51, ¶ 19, 768 N.W.2d at 520 (quoting *State v. Johnson,* 2007 S.D. 86, ¶ 22, 739 N.W.2d 1, 9). According to McCahren, any potential threats to the community were extinguished when officers observed the two juveniles on the lawn and McCahren immediately identified himself as the shooter. Therefore, McCahren believes his rights were violated as soon as Officer Waller asked any other questions. This is not the standard by which we determine whether McCahren was in custody and entitled to *Miranda* warnings.

[¶31.] When determining whether McCahren was in custody, the lower court found that McCahren was not searched or handcuffed, and he was allowed to keep his phone and make calls. It further found that Waller did not attempt to elicit a confession; his questions were ones to gain an understanding and determine whether a crime had been committed. The court concluded that McCahren was not in custody. Therefore, his Fifth Amendment rights were not violated nor did the parental notification statute apply.[8] Our review of the record supports the circuit

---

8. Even if SDCL 26-7A-15 was applicable, Defendant has not cited authority that suppression of the statements at issue is the appropriate remedy for failing to follow a statute as contrasted with the constitutional rights enumerated in *Miranda,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694. Although failure to notify a parent could be relevant to a determination of whether a statement was voluntary, the involuntariness of any statement has not been shown under the totality of the circumstances. *See State v. Horse,* 2002 S.D. 47, ¶ 26, 644 N.W.2d 211, 224.

court's findings and conclusions. At one point during the conversation, Officer Waller told McCahren that the door of the police car was unlocked. At no point did Waller tell McCahren that he was not free to leave the patrol car, and he did not restrain McCahren's ability to leave. *See State v. Deal*, 2015 S.D. 51, ¶ 18, 866 N.W.2d 141, 147. As the circuit court found, Waller's questioning was neither lengthy nor aimed at McCahren as a suspect. The objective circumstances surrounding Waller's questioning of McCahren were not such that a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave. *Id.* McCahren was "not so deprived of his freedom as to be 'in custody' for *Miranda* purposes." *See id.* (quoting *Thompson*, 1997 S.D. 15, ¶ 26, 560 N.W.2d at 541).[9]

[¶32.]  Further, Officer Waller's questions were "general, on-the-scene" questions. "A law enforcement officer is not required to deliver a *Miranda* warning when his questions constitute 'general on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process.'" *Bowker*, 2008 S.D. 61, ¶ 31, 754 N.W.2d at 66 (quoting *State v. Bartunek*, 323 N.W.2d 121, 124 (S.D. 1982)). As we have explained, "[g]eneral on-the-scene questioning and fact gathering is absolutely essential for law enforcement officers to

---

9.  McCahren was later arrested, and transported to the police station. No one read him his *Miranda* rights, but he was asked several questions during the ride to the police station. The court suppressed the statements McCahren made during that transport. At the station McCahren was placed in a sequestered room for two and a half hours while waiting for his father to arrive. An officer continued to make conversation with McCahren without reading him any *Miranda* rights. The court also suppressed the statements McCahren made during that time.

perform their jobs well and to investigate possible crimes." *State v. Herting*, 2000 S.D. 12, ¶ 10, 604 N.W.2d 863, 865.

> When circumstances demand immediate investigation by the police, the most useful, the most available tool for such investigation is general on-the-scene questioning, designed to bring out the person's explanation or lack of explanation of the circumstances which aroused the suspicion of the police, and enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges.

*Id.* (quoting *People v. Haugland*, 171 Cal. Rptr. 237, 241 (Cal. Ct. App. 1981)).

Upon arrival, Officer Waller did not know what had happened beyond the fact that at least one person had been shot. The circumstances of this case demonstrate the type of situation that requires "immediate investigation" to determine whether anyone else may be in danger and how law enforcement should proceed. A quick, general question of "what happened?" allowed Officer Waller to determine whether he "should allow [McCahren] to go about his business or hold him to answer charges." *See id.* During Waller's conversation with McCahren, Waller explicitly told McCahren that he was not going to jail at that time. *See id.* Thus, Officer Waller was properly attempting to determine whether a crime had occurred. Consequently, we affirm the circuit court's refusal to suppress McCahren's on-the-scene statements to Officer Waller. Because McCahren was not in custody, his Fifth Amendment rights were not violated and the parental notification statute, SDCL 26-7A-15, did not apply.

*Sentence for aggravated assault*

[¶33.] Lastly, McCahren asks us to remand this case for resentencing on the aggravated-assault conviction. Aggravated assault is a Class 3 felony punishable by a maximum of fifteen years imprisonment and a thirty-thousand dollar fine. SDCL 22-18-1.1; SDCL 22-6-1. The court sentenced McCahren to the maximum fifteen-year sentence for assaulting Youngberg. McCahren asserts that his sentence is cruel and unusual, which is prohibited by the Eighth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment.

[¶34.] "When a defendant challenges a sentence as cruel and unusual under the Eighth Amendment, this Court reviews it for gross disproportionality." *State v. Craig*, 2014 S.D. 43, ¶ 33, 850 N.W.2d 828, 837. "[T]he Eighth Amendment does not require strict proportionality between the crime and sentence. Rather, it forbids only extreme sentences that are grossly disproportionate to the crime." *State v. Chipps*, 2016 S.D. 8, ¶ 33, 874 N.W.2d 475, 487 (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001, 111 S. Ct. 2680, 2705, 115 L. Ed. 2d. 836 (1991) (Kennedy, J., concurring in part and concurring in the judgment)). Our threshold inquiry is whether the sentence appears grossly disproportionate. *Id.* ¶ 35. To answer the threshold question, we consider "the gravity of the offense and the harshness of the penalty." *Id.* ¶ 38, 874 N.W.2d at 488 (quoting *Solem v. Helm*, 463 U.S. 277, 290-91, 103 S. Ct. 3001, 3010, 77 L. Ed. 2d 637 (1983)). If the comparison fails to suggest gross disproportionality, our review ends. *Id.* at 489.

[¶35.] First we consider the gravity of McCahren's offense—"the offense's relative position on the spectrum of all criminality[.]" *State v. Rice*, 2016 S.D. 18, ¶

13, ___ N.W.2d ___. In this case the gravity of McCahren's offense is relatively great on the spectrum of all criminality. He took a shotgun, pointed it in the direction of Youngberg and repeatedly pulled the trigger. According to Youngberg, McCahren loaded the shotgun when it failed to discharge and pulled the trigger again. In McCahren's own words, this was in an attempt to "scare the shit out of" Youngberg. McCahren endangered Youngberg's life and may have killed Youngberg had Williams not been in front of Youngberg. *See State v. Garreau*, 2015 S.D. 36, ¶ 11, 864 N.W.2d 771, 776 (finding relevant for the gravity inquiry that, but for the officer's vest, defendant inflicted a potentially-life-threatening injury on a law enforcement officer).

[¶36.] Next, we consider the harshness of McCahren's penalty—"the penalty's relative position on the spectrum of all permitted punishments." *Rice*, 2016 S.D. 18, ¶ 13, ___ N.W.2d at___ (quoting *Chipps*, 2016 S.D. 8, ¶ 37, 874 N.W.2d at 488). The Legislature has authorized more severe punishments of death (Class A felonies) and mandatory life imprisonment (Class A and Class B felonies). In addition, McCahren will be eligible for parole. *See Chipps*, 2016 S.D. 8, ¶37, 874 N.W.2d at 488 ("The possibility of parole is also considered in judging the harshness of the penalty."). His initial parole eligibility date is in March of 2021.

[¶37.] McCahren contends that receiving the maximum sentence allowed for aggravated assault is indicative of gross disproportionality. However, the fact that a defendant receives the "maximum [sentence] permitted by statute for [a] particular offense [is] not relevant to an Eighth Amendment analysis." *Rice*, 2016 S.D. 18, ¶ 19, ___ N.W.2d ___. Instead, such a fact is relevant in assessing whether

the sentencing court abused its discretion. *Id.* ¶¶ 19, 23, ___ N.W.2d at___.

McCahren also asserts that "the absence of aggravating circumstances and the

existence of mitigating qualities of youth illustrate the sentence's gross

disproportionality." But "mitigating factors generally are not considered in

noncapital cases." *Id.* ¶ 18 n.3, ___N.W.2d at ____. Although, "mitigating qualities

of youth" must be considered before a court may impose a life sentence without

parole on a juvenile, *see State v. Springer*, 2014 S.D. 80, ¶ 13, 856 N.W.2d 460, 465-

66 (citing *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455, 2467, 183 L. Ed. 2d 407

(2012)), a life sentence is not an authorized punishment for the offense of

aggravated assault, and the court did not impose such a sentence. *Springer* and

*Miller* do not require the court to consider the mitigating qualities of youth for

Eighth Amendment challenges. Youth may be considered in crafting a sentence,

but such a consideration is a "discretional dimension[] of sentencing." *Rice*,

2016 S.D. 18, ¶ 29, ___ N.W.2d at ___. McCahren's sentence fails to suggest gross

disproportionality, and thus our review ends. *See State v. Coleman*, 2015 S.D. 48, ¶

11, 865 N.W.2d 848, 851. Finally, McCahren's arguments regarding his sentence do

not demonstrate that the court abused its discretion. *See Rice*, 2016 S.D. 18, ¶ 23,

___ N.W.2d at ___. We affirm McCahren's sentence.

**Conclusion**

[¶38.]     McCahren had sufficient notice that a lesser-included offense

instruction on second-degree murder could be given when he was indicted on first-

degree murder. The circuit court appropriately limited the defense's cross-

examination of one of the State's witnesses. McCahren's constitutional and

statutory rights were not violated when the court refused to suppress the statements McCahren made to T.D. or Officer Waller. Finally, McCahren's sentence for aggravated assault is neither cruel and unusual punishment nor an abuse of discretion. We affirm.

[¶39.]     GILBERTSON, Chief Justice, and HOUWMAN, Circuit Court Judge, concurs.

[¶40.]     MYREN and SABERS, Circuit Court Judges, concur specially.

[¶41.]     MYREN, Circuit Court Judge, sitting for ZINTER, Justice, disqualified.

[¶42.]     HOUWMAN, Circuit Court Judge, sitting for WILBUR, Justice, disqualified.

[¶43.]     SABERS, Circuit Court Judge, sitting for KERN, Justice, disqualified.


SABERS, Circuit Court Judge (concurring specially).

[¶44.]     What happened here was wrong in a great many ways. I write separately to discourage litigators from following this path in the future. Nevertheless, I respectfully but reluctantly concur.

[¶45.]     In oral argument to this Court, defense counsel argued that this is a case about notice. And, indeed, it is. As outlined in the majority opinion, a state statute expressly informs its readers that second-degree murder is a lesser included offense of first-degree murder. SDCL 22-16-20.1. That statute went into effect in 2005. 2005 S.D. Sess. Laws ch. 120, § 436. Our caselaw also makes clear that,

although a less-than-perfect fit, second-degree murder satisfies the elements test previously adopted by this Court. *See, e.g., State v. Giroux,* 2004 S.D. 24, ¶ 7, 676 N.W.2d 139, 142; *State v. Hoadley,* 2002 S.D. 109, ¶ 64, 651 N.W.2d 249, 264. But the prosecution tried this case, both in and out of the courtroom, as a first-degree murder case. It was never a second-degree murder case.[10] Before trial began, the prosecution even filed a motion to preclude the defense from asking for an instruction on second-degree manslaughter arguing, in part, that there was no basis for such an instruction because the evidence of premeditation was so strong. As a result, no one can fault the defense for being surprised at the prosecution's eleventh-hour request for an instruction on second-degree murder.

[¶46.]     The trial court here was put in a remarkably difficult position by the procedural posture in which the issue arose. As the majority points out, the prosecution first requested the lesser included offense instruction following the close of evidence, just minutes before closing arguments were to be given. This was the very first time the defense or the trial court had heard of this reversal in the prosecution's theory of the case. Had the defense requested a continuance to respond to the newly added charge, the trial court would almost certainly have granted that request. After multiple days of trial, the jury would have been sent away for an indeterminate amount of time, while the court hoped for unfailing adherence to the jurors' oaths of confidentiality—all of this in a highly publicized case. Alternatively, the trial court could have denied the requested instruction, and

10. As to the homicide, the prosecution sought and secured an indictment for first-degree murder only. The indictment did not include any charges of second-degree murder or manslaughter.

risked reversal from this Court.[11]  Neither of these options are fair expectations of the trial court.

[¶47.]        Meanwhile, the defense had no obligation to present any evidence.  At the close of the prosecution's case, the defense likely reached the same conclusion as did the prosecution—that the record evidence of premeditated murder had fallen short of a conviction.  So, the defense responded accordingly.  The defense put on no psychiatric testimony—evidence that was arguably relevant to the depraved-mind-theory of the uncharged second-degree murder count.[12]  The defendant did not take the stand—perhaps signaling a strategic decision that it was unnecessary, given the weak evidence of premeditation.  And then, just minutes before closing arguments, the defense was met with an entirely new and, on these facts, unexpected theory of the case when the prosecution threw a new charge at the wall hoping it would stick.

[¶48.]        Despite these concerns, I concur.  The majority's opinion is well-reasoned and thoroughly and accurately sets forth the settled law of this State.  According to that law, what occurred here was constitutionally permissible.  It was also unnecessary.  Just because we can do something, does not mean that we should.  We have many rules in place throughout our system of justice to prevent

---

11.    When a defendant files a direct appeal, the prosecution may file a notice of review challenging the refusal to give a requested instruction. *See* SDCL 23A-32-14; *see generally State v. Vandergrift*, 1997 S.D. 5, ¶ 8, 558 N.W.2d 862, 864 (declining to consider an issue where the prosecution failed to file a notice of review under SDCL 15-26A-22).

12.    Such testimony was available given the expert testimony previously offered at the juvenile transfer hearing.  That testimony included an opinion that the defendant's executive functioning capability was that of an 11- or 12-year-old.

trial by ambush.  I suggest we steer clear of a practice that allows for charging by ambush.

[¶49.]        MYREN, Circuit Court Judge, joins this special concurrence.