Filed 6/18/20

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E071585 |
| v. | (Super.Ct.No. SWF1700598) |
| YI CHIH CHEN, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. James S. Hawkins, Judge. Affirmed.

Timothy Allen Scott and Nicolas O. Jimenez, for Defendant and Appellant.

Xavier Becerra, Attorney General, Julie L. Garland, Assistant Attorney General, Michael P. Pulos, Seth M. Friedman and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

Good fences make good neighbors, but here the attempted replacement of a fence led defendant to threaten his neighbors with a shotgun. Following a jury trial, defendant was acquitted on felony charges but convicted on a misdemeanor brandishing charge and sentenced to 36 months of summary probation. At trial, his position was that he acted in defense of property. We affirm, holding that displays of deadly force are an unreasonable

1

means of defending property where there is no home invasion or threat of death or serious bodily harm. Nineteenth century California law established this proposition, which remains valid today.

## I. FACTUAL AND PROCEDURAL HISTORY

In September 2017, defendant and appellant Yi Chih (Steve) Chen called the Riverside County Sheriff's Department for assistance with a neighbor dispute. When deputy sheriff Christina Weber arrived at Chen's home in Temecula, Chen asked that she stop his neighbors from taking down a shared fence that day. The neighbors, a married couple, sought to replace the fence and had hired contractors, but Chen objected to the plan. Weber explained to everyone that it was "a civil issue" and that they should take the matter up in civil court. The fencing company hired by the neighbors arrived at around this time. Before leaving, and perhaps sensing the tension between Chen and his neighbors, Weber told Chen, "please do not make any poor decisions and going and attacking people and . . . doing anything criminally [so] that I have to come back out."

Instead of heeding Weber's advice, Chen went upstairs to his bedroom and began pointing a shotgun from his window toward the neighbors and two of the contractors. The neighbors, who captured the incident on video, called 911. Weber, who had only driven "maybe a half a block to a block away," was sent back to the scene and ultimately arrested Chen.

Chen was charged with four counts of assault with a firearm (Pen. Code, § 245, subd. (a)(2)),[1] a felony, and one count of brandishing a firearm (§ 417, subd. (a)(2)), a misdemeanor. The jury acquitted Chen on the assault charges and convicted him on the misdemeanor. The trial judge granted Chen summary probation for 36 months and allowed him to serve, via an ankle monitor, the three months of mandatory jail time required by the Penal Code for brandishing. (See § 417, subd. (a)(2)(B).)

## II. ANALYSIS

Chen raises three issues on appeal, which we address in turn.[2]

A. *Suppression of Evidence*

Chen contends that evidence obtained during the warrantless search of his home, conducted while Chen was handcuffed and in Weber's patrol vehicle, should have been suppressed. Whether or not the search violated the Fourth Amendment, admitting the evidence was harmless error.

At issue is the admission into evidence of the shotgun, its ammunition, and video footage captured by Chen's wife, rather than the video shot by the neighbors. At the suppression hearing, Weber testified that while searching Chen's home, she noticed a

---

[1] Further undesignated statutory references are to the Penal Code.

[2] We have jurisdiction even though the Superior Court's appellate division has jurisdiction over most misdemeanor appeals. The Court of Appeal has appellate jurisdiction over "felony case[s]" (§ 1235), which means "a criminal action in which a felony is *charged* and includes a criminal action in which a misdemeanor or infraction is charged in conjunction with a felony" (§ 691, italics added). (See also *People v. Morales* (2014) 224 Cal.App.4th 1587, 1594-1599.)

camera mounted on a tripod in Chen's bedroom.[3]  After Weber had entered the home,

Chen's wife gave Weber permission to view the footage from that camera, which

depicted the incident from a different angle than that of the neighbors, and Weber

captured the footage by using her cell phone to record the camera's display screen.

Weber's video was played for the jury, as was the video the neighbors recorded.

We agree with Chen that Weber's search was not justified under either the

"exigent circumstances" exception to the warrant requirement or the exception for a

"protective sweep."  "In terms that apply equally to seizures of property and to seizures

of persons, the Fourth Amendment has drawn a firm line at the entrance to the house.

Absent exigent circumstances, that threshold may not reasonably be crossed without a

warrant."  (*Payton v. New York* (1980) 445 U.S. 573, 590.)  In order to show exigent

circumstances based on a "risk of danger to police officers or others on the scene," a

warrantless entry into a home "must be supported by *probable cause* to believe that *a*

*dangerous person* will be found inside."  (*People v. Celis* (2004) 33 Cal.4th 667, 678,

second italics added.)  The People do not even attempt to argue that Weber had the

requisite probable cause here.  Although the People contend instead that Weber

conducted a protective sweep, which "can be justified merely by a *reasonable suspicion*

that the area to be swept harbors a dangerous person" (*ibid.*), Weber had no "articulable

---

[3]  It is possible Weber knew about the camera in the bedroom before the search; at one point during her first visit, she told Chen:  "And I see—and I see you recording and I—like I told them, if you're going—if there's going to be an issue, I highly recommend you record because you don't wanna have your word against their word."

facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene" (*Maryland v. Buie* (1990) 494 U.S. 325, 335). As Weber testified at the suppression hearing, she saw no signs that Chen's wife posed a danger and had no information indicating to her that anyone else was in the home. The mere fact she could not exclude the possibility of a dangerous person in the home, without more, fails to justify a protective sweep. (See, e.g., *People v. Celis*, *supra*, 33 Cal.4th at pp. 679-680 [protective sweep unjustified where officers had no information "'as to whether anyone was inside the house'" and no indication that anyone was armed]; *People v. Werner* (2012) 207 Cal.App.4th 1195, 1207 [protective sweep unjustified where "there was no evidence that deputies were aware of any ongoing criminal activity in the home, or that there were others even present inside, let alone that it 'harbor[ed] a dangerous person'"].)

However, as the People observe, in *People v. Mitchell* (1990) 222 Cal.App.3d 1306, the Court of Appeal held that suppression of evidence was not warranted, in part because the defendant told officers a firearm was in the house. (*Id.* at p. 1313.) According to the court, because the officers were retrieving the firearm and the defendant had told the officers where it was, the police "'were not "searching" for anything,'" and defendant "gave up any reasonable expectation of privacy" "as to the presence of the shotgun within his home" by acknowledging its location. (*Id.* at pp. 1313-1314.) *Mitchell* even involved defendant brandishing a shotgun at his neighbor over "property lines and a wall." (*Id.* at p. 1309.)

In reaching its holding on the suppression of evidence, however, *Mitchell* relied on a case not involving the warrantless entry of a home. (See *Mitchell*, *supra*, 222 Cal.App.3d at p. 1313, citing *People v. Haugland* (1981) 115 Cal.App.3d 248 [search of weapon in briefcase].) This is problematic, as "[i]t is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" (*Welsh v. Wisconsin* (1984) 466 U.S. 740, 748; see also *Kyllo v. United States* (2001) 533 U.S. 27, 31 ["With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no"].)

We need not ultimately resolve the propriety of Weber's search or the merits of *Mitchell* here, for even if we were to assume that the search violated the Fourth Amendment, admission of the evidence was harmless error. "Admission of unlawfully seized evidence is not reversible per se, but rather is subject to harmless error analysis."

6

(*People v. Kraft* (2000) 23 Cal.4th 978, 1036.) The Penal Code proscribes, other than in self-defense, "draw[ing] or exhibit[ing]" in the presence of another person "any firearm, whether loaded or unloaded, in a rude, angry, or threatening manner, or . . . in any manner, unlawfully us[ing] a firearm in any fight or quarrel." (§ 417, subd. (a)(2).) There was no real dispute that Chen drew his shotgun in a threatening manner here. The neighbors' video, indisputably admissible, captured Chen pointing his shotgun out the window for about a minute, while he and the neighbors maintained a tense, hostile conversation. Although Chen asserted that he pointed the shotgun directly at the fence and not at any person, he agreed with the People's assessment that he "wanted them to feel like maybe [he] was going to shoot them if they didn't stop" working on the fence. His only defense, as indicated in his closing argument, was that he was acting in defense of his property.[4] None of the evidence taken from Weber's warrantless search (i.e., Weber's video, the shotgun, and the ammunition), however, could have affected the conviction here, including the jury's rejection of Chen's defense of property theory, which we address below. On this record, "[w]e have no doubt that the jury would have

---

[4] From his closing argument: "Now, I want to make a concession to you. If Mr. Chen was in a bowling alley or on a street corner or in a different situation, him holding the gun in the way that he did would be a textbook example of brandishing a firearm and he would be guilty of [section] 417. That's just the truth, and I'm not going to argue to you otherwise. [¶] But that's not this case. This case is a situation where he is defending his own property from his own home when they're trying to destroy property over his explicit objection. There is a defense of property instruction that the Court has given you. That is the law of our land, that you are permitted to defend your property if it's in danger of imminent destruction."

reached the same verdict had the evidence . . . not been admitted at trial." (*People v. Moore* (2011) 51 Cal.4th 1104, 1138.)

B.  *Exclusion of Evidence*

Chen next contends that the trial court erred in excluding evidence about the neighbors' alleged failure to comply with either the homeowners association rules or the Good Neighbor Fence Act of 2013 (Civ. Code, § 841, added by Stats. 2013, ch. 86, § 3).  Chen argues that the neighbors' noncompliance would have shown that he acted reasonably in defending his property.[5]  Not so.  Whether or not the neighbors complied with civil rules and statutes, the law does not entitle Chen to brandish a shotgun to protect against the removal of the fence.

The Restatement Second of Torts states that in order for use of deadly force to be justified as a defense, the intrusion must threaten death or serious bodily harm.  (See Rest.2d Torts, § 79, com. d ["One is no more privileged to use [force intended or likely to cause death or serious bodily harm] to prevent another from intruding upon his dwelling place than he is to use similar force to prevent the other from intruding upon his possession of any other land.  In either case, he may use such force *if the intrusion threatens death or serious bodily harm to the occupiers or users of the land*.  In neither

---

[5]  Section 417, subdivision (a)(2) states that "[e]very person who, except in self-defense, in the presence of any other person, draws or exhibits any firearm, whether loaded or unloaded, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a firearm in any fight or quarrel" is punishable by law.  At trial, the jury was told that "[t]he owner or possessor of real property may use reasonable force to protect that property from imminent harm."  (See § 693; CALCRIM No. 3476.)

8

case may he do so unless the intrusion threatens such consequences."], italics added.) A leading criminal law treatise similarly notes that, where harm to only property is threatened, it is unreasonable to defend using deadly force. (See 2 LaFave, Substantive Criminal Law (3d ed. 2018) § 10.6(a) ["[E]ven when it is reasonable to use some force, it is not reasonable to use deadly force to prevent threatened harm to property, such as a mere trespass or theft, even though the harm cannot otherwise be prevented."], footnote omitted.) And our Supreme Court long ago held that "[o]ne is not justified in taking human life to prevent the commission of a mere trespass." (*People v. Hecker* (1895) 109 Cal. 451, 461; see also *People v. Flanagan* (1881) 60 Cal. 2, 3 ["It is undoubtedly true, as a legal proposition, that human life can not be taken to prevent a mere trespass upon property."].)[6] The above authorities all speak in terms of *using* deadly force, but the principles they invoke apply to threats of deadly force as well. (See, e.g., Rest.2d Torts, § 80 ["The actor is privileged intentionally to confine another or put him in *apprehension* of a harmful or offensive contact for the purpose of preventing or terminating the other's intrusion upon the actor's possession of land or chattels under the same conditions as create a privilege to *inflict* a harmful or offensive contact or other bodily harm upon the other for the same purpose."], italics added; *Commonwealth v. Alexander* (Va. 2000) 260 Va. 238, 241 [rejecting notion that "these principles do not apply when there is a mere

---

[6] Depending on the circumstances, trespass is sometimes a tort and sometimes a crime. (See, e.g., § 602 [misdemeanor trespass]; *Intel. Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1350-1360 [discussing tort of "trespass to chattels"].)

threat to use deadly force in protection of personal property"]; *State v. Buckley* (Vt. 2016) 202 Vt. 371, 384-389 [same].)

There are at least two reasons why such principles remain wise. For one, "the preservation of human life is more important to society than the protection of property." (LaFave, *supra*, § 10.6(a), footnote omitted; see also *People v. Doud* (Mich. 1923) 223 Mich. 120, 130 ["The law forbids such a menacing of human life for so trivial a cause."].) For another, the use or threat of deadly force may cause the threatened person to "defend himself by the use of a deadly weapon," which could "'lead[] in dangerous progression to an unacceptable conclusion.'" (*Commonwealth v. Alexander*, *supra*, 260 Va. at p. 242.)

Importantly, this is not a situation involving a home invasion, nor even a defense against some other crime potentially involving death or serious bodily harm. Section 198.5 provides a statutory presumption of "reasonable fear" when one uses deadly force against someone who has "unlawfully and forcibly entered the residence" and is not a member of the family or household. Likewise, a defense against a person committing some other crime could warrant deadly force, depending upon the facts. As our Supreme Court concluded in *People v. Ceballos* (1974) 12 Cal.3d 470, even in defending against someone committing a felony, where the "'character of the crime, and the manner of its perpetration'" "'do not reasonably create a fear of great bodily harm,'" "there is no cause for exaction of a human life [citations], or for the use of deadly force." (*Id.* at pp. 477-479.) Using or threatening deadly force is presumptively acceptable in a home invasion

10

situation covered by section 198.5 and may be acceptable when another serious crime is being committed, depending upon the facts.

But it is never acceptable to use or threaten deadly force solely to defend property. Here, nothing in the record indicates that the neighbors forcibly entered Chen's home or that they committed any felonies, much less any that threatened death or serious bodily harm. Instead, the neighbors simply sought to remove and replace a shared fence. Accordingly, whether or not the neighbors complied with homeowners association rules or the Civil Code, Chen was not legally justified in brandishing a deadly firearm.

In contending that defense of property is a defense to brandishing, Chen relies on three cases, but none of them convince us that defense of *only* property can involve threats of deadly force. First, Chen relies on *Fawkes v. Reynolds* (1922) 190 Cal. 204, where our Supreme Court stated that a defendant "had the undoubted right to protect the property in his possession by the use of all force reasonably necessary for that purpose." As an abstract statement, the rule is accurate and uncontroversial. (See, e.g., *Kentucky Fried Chicken of Cal., Inc. v. Superior Court* (1997) 14 Cal.4th 814, 829 ["Both article I, section 1 of the California Constitution and Civil Code section 50 recognize the right of any person to defend property with reasonable force."], fns. omitted.) That does not mean, however, that displays of deadly force can be reasonably necessary to protect a threat that is made solely to property. Second, Chen relies on *People v. Kirk* (1986) 192 Cal.App.3d Supp. 15, 17-19, where the court held that the brandishing statute is subject to a defense of others exception as well as an exception for self-defense. But again, even

11

if defense of other *people* defeats a brandishing charge, it does not necessarily follow that one may generally use deadly force to defend *property*. And third, Chen relies on *Lorenz v. Hunt* (1928) 89 Cal.App. 6, 12, disapproved on another ground in *Vaughn v. Jonas* (1948) 31 Cal.2d 586, 606, where the Court of Appeal stated that the plaintiff's display of a loaded revolver was reasonable to prevent "the forcible and unlawful entry of the defendant." In that case, however, before the plaintiff retrieved the revolver, the defendant had struck her, shoved her over a fence, and repeatedly threatened her with a "violent temper," saying that he would "fix" her and "lay [her] out." (See *Lorenz v. Hunt*, *supra*, at p. 9.) Thus, the case refers to a "forcible" entry that involved both the actual use of physical force against the gun-brandisher and the threatened imminent use of further force; the gun was not drawn merely to defend property.

C. *Reopening the People's Case-in-chief*

Lastly, Chen contends that the trial court should not have allowed the People to reopen its case-in-chief. We disagree.

On this we begin with some additional background. In the morning after the People rested its case, but before Chen began his, the People sought to reopen to clear up a point of potential confusion. Weber had originally testified that she believed the ammunition retrieved from Chen's shotgun was birdshot, even though the prosecutor personally believed it was buckshot based on personal experience and the information printed on the shells. The People wanted to reopen to allow Weber to clarify because they believed there was "a good chance that one juror or more . . . will know the

12

difference and it will be this funky thing where the evidence says one thing and they think it's something else." The trial court allowed the People to reopen and Weber testified that, since her prior testimony, she had come to believe the ammunition could potentially be buckshot. Weber also testified that she refers to ammunition as birdshot whenever it contained pellets, even if doing so may be inaccurate.

Chen contends that the trial court abused its discretion in reopening the case for three reasons: first, that Weber lacked personal knowledge about the subject matter of her testimony; second, that it brought undue attention to whether the ammunition was buckshot (which the parties appear to agree is more dangerous than birdshot); and third, that it "unfairly" undermined Chen's credibility given that he testified it was birdshot.

The trial court has "'broad discretion to order a case reopened and allow the introduction of additional evidence'" (*People v. Riley* (2010) 185 Cal.App.4th 754, 764), and it did not abuse its discretion here. First, on recall, Weber testified as to how she refers to ammunition, a matter undeniably within her personal knowledge. Her testimony also made clear that the prosecutor had approached her regarding the ammunition after her initial testimony, which likely provided at least part of her basis for stating on recall that it was possibly buckshot. If the jury found such basis lacking, it was free to discredit her testimony on that point, but allowing Weber to testify on such a basis was not an abuse of discretion. Second, whether the ammunition was buckshot or birdshot would not have influenced the jury on the brandishing charge, as liability does not turn on the type of ammunition a firearm was loaded with, or even whether it was loaded at all. (See

13

§ 417, subd. (a)(2) [brandishing of firearm prohibited whether the firearm is "loaded or unloaded"].)  And finally, there is no possibility that Weber's testimony on recall could have cast doubt on Chen's credibility in an unfair way given that Chen testified after Weber.  Chen could not have, for instance, been misled by Weber into saying it was birdshot.

### III.  DISPOSITION

The judgment of conviction is affirmed.

CERTIFIED FOR PUBLICATION

RAPHAEL          
                                                                J.

We concur:

RAMIREZ          
                    P. J.


CODRINGTON     
                    J.


14